[No. A025197. Sixth Dist. Mar. 6, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
JASON SUBIELSKI, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Only the introductory section, the facts section, part 2 of the discussion section and the disposition are certified for publication.

COUNSEL

Robert Fiedler, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Linda Ludlow and Ann K. Jensen, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**PANELLI, P. J.**—Defendant Jason Subielski appeals from a judgment of conviction entered on jury verdicts finding him guilty of robbery (Pen. Code, § 211)[2], assault with a deadly weapon, a sawed-off shotgun (§ 245, subd. (a)), and possession of a sawed-off shotgun (§ 12020). The jury further found that a handgun had been used in the commission of the robbery (§ 12022, subd. (a)). He contends that the trial court 1) improperly instructed the jury on the burden of proof of his duress defense; and 2) failed to instruct the jury *sua sponte* that evidence of duress could negate the specific intent required for a robbery conviction. For reasons explained below, the judgment is affirmed.

*Facts*

On July 14, 1983, at approximately 3 a.m., defendant, who was wearing a clown mask and carrying a sawed-off shotgun, together with Randal Wolfenbarger, who was wearing a nylon stocking mask, entered the 7-11 store in Toro Park, Monterey County. Defendant pointed the shotgun at the clerk, Kevin Olson (Olson), and ordered him to the back of the store. Defendant, with the two men close behind, walked to the back of the store. Defendant

---

[2]All further statutory references are to the Penal Code.

then told Olson to "get on the floor," after which Olson was hit about the shoulders and head by one of the men, causing him to momentarily lose consciousness. Olson heard the defendant order Wolfenbarger to get the money out of the register, but the register wouldn't open. One of the men then tried to open the office door, but was unable to do so. When Olson heard the men leave, he crawled to the phone and dialed 911.

Shortly thereafter, Sergeant Charles Lowery of the California Highway Patrol, after hearing a call regarding a robbery of the 7-11 store, effected a stop of a vehicle a short distance from the store. Defendant, Wolfenbarger, and Wolfenbarger's girlfriend, the occupants of the car, were placed under arrest. Items found in the car included a lead pipe, a Halloween mask, a set of nylons, a sawed-off shotgun, and a clip containing .22 ammunition.

After being advised of his *Miranda*[3] rights, defendant agreed to discuss the case with Deputy Sheriff Dugan.

Defendant told the officer that earlier, during the evening of July 13, he had driven around Salinas with Wolfenbarger, who had stated that he needed money and knew where to get it. Wolfenbarger also told defendant that he had stolen his father's shotgun that afternoon and had sawed off the barrel. Between 10:30 and 11 p.m., Wolfenbarger dropped defendant off at the home of a friend, where defendant went to sleep in the back of a pickup truck. At approximately 2 a.m., defendant was awakened by Wolfenbarger, who told him to get dressed; that they were going somewhere to get some money. When defendant got to Wolfenbarger's car, he saw Wolfenbarger's girlfriend, Tiffany, sitting in the right front seat, and a sawed-off shotgun laying on the back seat of the car. They first drove to a gas station where Wolfenbarger told defendant to buy some gas. Thereafter, Wolfenbarger told defendant that they were going to rob an all-night store and that defendant would carry the shotgun, go into the store, force the clerk to the rear of the store and knock him out. Wolfenbarger further told defendant that if they were caught, defendant should jump out of the car, dispose of the weapons and take responsibility for the incident.

After arriving at the store, Wolfenbarger gave defendant a clown mask; Wolfenbarger wore a nylon mask. After retrieving the sawed-off shotgun from the car, defendant gave the gun and the clown mask to Wolfenbarger. Defendant then entered the store on the pretext of using the bathroom. Once inside the store, defendant asked the clerk for permission to use the restroom. After coming out of the restroom, defendant gave the clerk two dimes

---

[3]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

and a nickel in exchange for a quarter, played a game of Pac Man and then left the store. Once outside again, defendant donned the clown mask, armed himself with the shotgun, and reentered the store with Wolfenbarger at which time the above-noted robbery took place.

Portions of Deputy Dungan's report which were entered into evidence also indicated that defendant told the deputy that he had been threatened by Wolfenbarger in the past; that he repeatedly told Wolfenbarger that he did not want to be involved in the robbery; that he told Wolfenbarger he did not want to hit the clerk and did not want anyone to get hurt; that it was Wolfenbarger who struck Olson with the lead pipe he was carrying; that after having loaded the shotgun at Wolfenbarger's insistence, defendant surreptitiously removed the shells before entering the store and placed one in each front pocket; and that he feared that if he did not participate in the robbery, Wolfenbarger would beat him. It should be noted that the shotgun, when seized by the police, was unloaded and the shells were found in defendant's pockets.

At trial, defendant testified that although he was afraid of being hurt, he did not know whether he was in fear of his life, but that under the circumstances, he felt he had no alternative but to commit the robbery. He also testified that he was scared and didn't know what to think; that when he went into the store to use the restroom, he didn't see a telephone.[4] and didn't even think of warning Olson or asking for help.

### Discussion

1. *There was no reversible error regarding the trial court's instructions to the jury on the standard to be used in evaluating defendant's duress defense.*[*]

. . . . . . . . . . . . . . . . . . . . . .

2. *The court did not err in failing to instruct sua sponte that evidence of duress could negate the specific intent required for robbery.*

■  Principles controlling the duty of a trial court in criminal cases to instruct *sua sponte* are well settled. "[E]ven in the absence of a request, a trial court must instruct on the general principles of law governing the case, i.e., those principles relevant to the issues raised by the evidence, but need

---

[4]Olson testified that there was a telephone inside the store.

[*]See footnote, *ante,* page 563.

not instruct on specific points developed at trial. [Fn. omitted.] 'The most rational interpretation of the phrase "general principles of law governing the case" would seem to be as those principles of law *commonly* or closely and openly connected with the facts of the case before the court.' [Citations.]" (*People* v. *Flannel* (1979) 25 Cal.3d 668, 681 [160 Cal.Rptr. 84, 603 P.2d 1], fn. omitted.)

■ Defendant, in an analogy based on *People* v. *Flannel*,[9] *supra*, 25 Cal.3d 668, argues that the trial court had a *sua sponte* duty to instruct the jury that defendant's honest but unreasonable belief that he would suffer physical injury if he did not participate in the robbery could negate the requisite specific intent therefor,[10] i.e., the intent to permanently deprive the owner of his property. (*People* v. *Butler* (1967) 65 Cal.2d 569, 573 [421 P.2d 703].) The People contend, however, defendant's reliance on *Flannel* is misplaced. Again, we must agree.

There is no authority to support defendant's theory. As above-noted, the record herein contains no evidence supporting the defense of complete duress. There is nothing to indicate that defendant ever believed—reasonably or unreasonably—that his *life* was in danger, but only feared that he might be subjected to a physical beating if he did not participate in the robbery. Were we to accept defendant's argument, we would be obliged (1) to substitute the duress defense, which requires a reasonable fear for one's life, with a defense requiring only fear of some unspecified injury; and (2) to elevate this new theory, with no supporting precedent to do so, to the status of a general principle of law requiring a *sua sponte* instruction. We decline defendant's invitation to do so. Accordingly, we find that the trial court had no duty to instruct *sua sponte* on specific points developed at trial. (*People* v. *Flannel*, *supra*, 25 Cal.3d at p. 681.)

The judgment is affirmed.

Agliano, J., and Brauer, J., concurred.

---

[9]In *Flannel*, the California Supreme Court held that an honest but unreasonable belief in the need to defend would negate malice and reduce the crime of murder to manslaughter. (*Id.*, at p. 679.) Henceforth, the *Flannel* decision mandated that the trial court instruct *sua sponte* on this point whenever there was sufficient evidence therefor. (*Id.*, at p. 681.)

[10]We note that this was one of the issues considered in *People* v. *Smith* (Cal.App.) hearing granted January 27, 1983 (Crim. 22953).