[No. D004490. Fourth Dist., Div. One. Dec. 1, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES HARDY SMITH III, Defendant and Appellant.

**COUNSEL**

Handy Horiye, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Michael D. Wellington and Lilia E. Garcia, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WIENER, Acting P. J.**—James Hardy Smith III appeals the judgment entered on jury verdicts convicting him of murder in the first degree (Pen. Code, §§ 187, 189)[1] during the commission of a robbery (§ 211) and kidnapping for the purpose of robbery (§ 209, subd. (b)) alleged as special circumstances (§ 190.2, subds. (a)(17)(i) and (ii)) and as independent counts. The jury also found Smith was armed within the meaning of section 12022, subdivision (a) but that he did not personally use the firearm under section 12022.5. We set aside the finding of special circumstances and in all other respects affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Before July 1980, Michelle Kruse worked as a masseuse at an Escondido massage parlor owned and operated by William Hawthorne. When Kruse told Hawthorne she was quitting her job in mid-July, Hawthorne refused to pay her $75 of the amount she was owed.

Angry and upset, Kruse told her boyfriend Charles (Butch) Fleck about the incident. She reported Hawthorne appeared to carry thousands of dollars with him in a money belt and complained he had little reason to deny her

---

[1]Unless otherwise specified all statutory references are to the Penal Code.

the $75. Fleck became angry and wanted to confront Hawthorne and force him to pay Kruse the money, but Kruse dissuaded him. She was concerned about Fleck getting into trouble since he had only recently been released from prison on parole.

A few weeks later on August 7, Fleck and several friends gathered at his Escondido apartment to drink beer. The friends included defendant James (Sonny) Smith, whom Fleck had met while in prison. One of the other individuals present, David Wildasin, heard Fleck suggest to Smith the possibility of robbing a man with a money belt.

Smith spent the night of August 7 at Fleck's apartment. Kruse testified that on the morning of August 8 Smith remarked about needing some money. Fleck suggested a robbery of Hawthorne would allow them to get back Kruse's $75 plus some additional money the three could split. Kruse then left to take a shower. When she returned, she saw a pistol lying on the bed. She inquired about it because she was frightened, but Smith told her not to worry since the gun was only to be used to scare Hawthorne. He then showed her it was not loaded. Kruse testified that on leaving the apartment, Smith placed the revolver in his waistband.

Smith's version of the morning's events was somewhat different. He admitted a discussion regarding getting money from Hawthorne, but asserted it related only to the $75 owed to Kruse. Smith testified Fleck left at one point and returned with a pistol and holster wrapped in a newspaper. Smith asked what the gun was for and Fleck replied it was to "scare" Hawthorne. Smith indicated he did not like guns, examined the revolver, unloaded it, put the bullets in a jar, and gave it back to Fleck.

Smith, Fleck and Kruse then left to obtain a ski mask or masks, presumably for use in the robbery. They first checked with Ron Thompson, a friend of Fleck's. Thompson testified Fleck explained their plan to rob Hawthorne of several thousand dollars while Smith listened. Smith testified he remained behind when Fleck talked to Thompson and did not hear the conversation. In any case, Thompson did not have a ski mask so Fleck, Smith and Kruse went to a nearby store. Kruse testified they bought two masks; Smith stated they bought one.

Between 5 and 5:30 p.m., Kruse drove Fleck and Smith to an alley near Hawthorne's massage parlor. She testified Smith left the car carrying the pistol and Fleck carried a tire iron. Smith maintained he carried the tire iron and Fleck had the revolver.

Kruse then left and returned home. The only testimony regarding the details of the robbery and the events which followed came from Smith. He

testified Fleck instructed him to remain across the alley with the tire iron while Fleck waited with the pistol by Hawthorne's van which was parked behind the massage parlor. Smith's function was to ward off anyone coming up the alley. Neither Fleck nor Smith was wearing a mask.

Hawthorne came out of the massage parlor and got into the van. Fleck approached him and forced him at gunpoint into the back of the van. Fleck rolled down the window and called to Smith to "[g]et your fucking ass over here." When Smith approached, Fleck told him to drive the van. Smith protested that he just wanted to leave but Fleck insisted. Smith testified he was "scared shitless" and believed Fleck might shoot him if he did not comply.

Smith got in and drove the van while Fleck gave directions. Smith was so upset he scraped the passenger side of the van against a truck while leaving the alley. Fleck directed Smith to a deserted area of North Escondido. Fleck tied Hawthorne's hands behind him with some antenna wire he found in the van. After searching Hawthorne for money, Fleck got out of the van and directed Hawthorne at gunpoint over the top of a small hill nearby. Fleck told Smith he was going to tie up Hawthorne and leave him where he would be found in a couple of hours. Smith waited in the van. Several minutes later he heard a gunshot. He alternately walked and ran up the hill and discovered Fleck standing over Hawthorne's body holding the gun. Smith asked Fleck what happened and Fleck replied, "The fucking asshole." Shaken, Smith ran back to the van followed by Fleck. As Fleck drove, Smith threw the tire iron out the passenger's window. (See *post,* fn. 2.)

They drove to Fleck's apartment and met Kruse. She testified she asked if they did it, to which Smith replied they had, but it had not been worth it. According to Kruse, Fleck and Smith each took $300 from the robbery. According to Smith, he, Kruse and Fleck each received $132. They later abandoned Hawthorne's van in Escondido.

Hawthorne's body was discovered several days later as was his van. Fleck was arrested on August 21 and Smith was arrested a day later. After his arrest, Smith gave a tape recorded statement to police in which he admitted planning and participating in the robbery. He denied any involvement in the shooting itself and the details of the incident closely matched his trial testimony. In addition, while he was in jail, Smith discussed the crime with a fellow inmate, Lawrence Warfel. Warfel testified that Smith's story to him basically matched Smith's trial testimony except Smith had mentioned nothing about believing Fleck would shoot him if Smith did not drive the van.[2]

---

[2] Smith's statements to Warfel allowed sheriff's deputies to retrieve the tire iron at approximately the point Smith said he threw it out the window.

Kruse testified she asked Fleck who shot Hawthorne and Fleck told her it was Smith. She confronted Smith with this allegation while visiting him in jail. According to her testimony, Smith nodded that he had shot Hawthorne, but stated it was a "total accident and everybody would be surprised."

Smith and Fleck were charged with robbery (§ 211), kidnapping for the purpose of robbery (§ 209, subd. (b)) and murder (§§ 187 and 189). As to the murder, two special circumstances were alleged: murder in the course of robbery (§ 190.2, subd. (a)(17)(i)) and murder in the course of kidnapping (§ 190.2, subd. (a)(17)(ii)). In addition it was alleged that both defendants were armed with and personally used a firearm as to all three substantive counts. (§§ 12022, subd. (a) and 12022.5.) Prior convictions and prison terms were also alleged as to both Smith and Fleck. (§ 667.5, subd. (b).)

Smith was tried separately after Fleck's severance motion was granted. The jury found him guilty of robbery, kidnapping and first degree murder and determined both special circumstance allegations to be true. Although the jury found Smith was armed with a firearm within the meaning of section 12022, subdivision (a), it concluded he did not personally use a firearm in the commission of any of the crimes. (See § 12022.5.) In a separate penalty phase hearing, the jury fixed Smith's punishment at life imprisonment without the possibility of parole. (See § 190.3.) Sentences on the robbery and kidnapping convictions and related enhancements were stayed pursuant to section 654.

## DISCUSSION

### I

Smith's initial contentions focus on the admission of his taped statement given to sheriff's deputies following his arrest. He alleges the transcript of the statement demonstrates he did not knowingly, intelligently and voluntarily waive his *Miranda* rights before talking to the deputies. (See *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) And even if his statements on the tape are admissible, Smith contends the court erred in not excising certain portions of the tape during which the deputies were playing a portion of Fleck's tape-recorded statement for Smith to hear. Smith argues the failure to eliminate these portions violated his Confrontation Clause rights under *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. Recognizing his trial counsel's failure to object to the admission of any part of the taped statement would normally bar his raising these issues on appeal, Smith asserts such a failure constitutes a denial of his Sixth Amendment right to

effective assistance of counsel. (See *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

Smith's *Miranda*-related arguments focus on two separate occurrences during the interview. At the outset of the questioning, after the required *Miranda* admonition, Smith replied, "Um-hmm yeah. If I want an attorney, I got to wait all day. . . ." Smith contends this statement was sufficient to invoke his *Miranda* rights and halt questioning while an attorney was obtained.[3] (See and compare *People* v. *Degner* (1982) 131 Cal.App.3d 1049, 1053 [184 Cal.Rptr. 179].) Smith's second argument, although phrased in terms of an additional *Miranda* contention, is in essence a complaint that his statements were involuntarily obtained based on implied promises of leniency if Smith would admit participation in the robbery but identify Fleck as a triggerman.[4] He explains the police erred in stating his punishment

---

[3]After Smith's statement, the conversation continued as follows: "Q. [DEPUTY]: What do you want—

"A. [SMITH]: Find out what the hell's going on.

"Q. [DEPUTY]: Are you willing to talk to me?

"A. [SMITH]: Unhuh."

[4]The transcript of the taped interrogation reads in relevant part as follows:

"Q. [DETECTIVE HENDERSON]: Let me explain something to you. We talked to a lot of people. We arrested Butch [Fleck] yesterday. We got a full statement from Butch and everyone surrounding him.

"A. [SMITH]: I don't—

"Q. Sonny—

"A. Have nothing to do with it.

"Q. I'm just gonna tell you right now. I know you were there and I know you took part in it. I know that you were involved.

"A. I didn't have nothing to do with it.

"Q. And I know that you were dropped off after, but if you want to lie about it, go ahead and I'm—I'm not gonna lie to you. What happened is, you and Butch went down and robbed a·guy and you took him out in his vehicle—

"A. No.

"Q. And you dumped him and, uh, then you went and took the vehicle back to an old place where Butch used to live and dropped it off and that's what happened. And I'm telling you what-if they lay it on you as the trigger man, which is obviously what's happening, you're looking at an execution.

"A. I didn't do shit.

"Q. Murder as a result of a robbery, which carries, in the State of California, you're looking at the death penalty, and that's it.

"A. I didn't—I didn't—

". . . . . . . . . . . . . . . .

"Q. Sonny, uh, you're not a stupid person, obviously. But you're being very dumb right now. What you're looking at and I don't care how other you feel about it, you have—

"A. I—I didn't want to blow nobody away. I

". . . . . . . . . . . . . . . .

"Q. Then take the heat, go head and take the heat.

"A. I don't want to take heat for nothin cause I ain't got nothin to do with the fuckin shit. If Butch pulled a robbery, I never done a robbery before in my fucking life and whatever Butch has done—

would be less severe if he were only involved in the robbery because these statements ignored the operation of the felony-murder rule pursuant to which admission of the robbery is tantamount to the admission of first degree murder. (See *People* v. *Johnson* (1969) 70 Cal.2d 469, 478-479 [74 Cal.Rptr. 889, 450 P.2d 265]; compare *People* v. *Garcia* (1984) 36 Cal.3d 539, 546-547 [205 Cal.Rptr. 265, 684 P.2d 826].)

■ We need not decide either substantive contention since we have concluded that even if they are correct, Smith has failed to demonstrate ineffective assistance of counsel on this record. Although incriminating, the tape-recorded statements paint a not unsympathetic portrait of Smith as an essentially nonviolent individual unsuspectingly caught in Butch Fleck's violent enterprise. Since the substance of Smith's admissions would have been presented to the jury in any event by way of Lawrence Warfel's testimony, defense counsel may well have concluded that admission of the

---

"Q. You did two weeks ago.

"A. No, I ain't.

"Q. Look, if you robbed a guy and Butch did something crazy and shot him because he was pissed off about Michelle, God damn it, don't be taking the heat for that, but I'm telling you right there—you heard what he's saying and it goes on and on and Sonny, you're going to be convicted. It's plain and simple. You're going to be convicted, but tell us the truth.

"Q. [DETECTIVE STREED]: We're not just talking about, uh, what Butch had to say, Sonny. There are other people we've talked to also. A lot of people—a lot of people know about this. Everyone—everyone I've interviewed—

". . . . . . . . . . . . . .

"Q. [HENDERSON]: If you're involved in the robbery, you're involved in the robbery. If you didn't kill the guy, let's hear it.

"Q. [STREED]: The fact of the matter is, you were there and we know you were there. We know about the gun. We know about you flashing the gun around at Butch's place, showing Michelle it wasn't loaded cause she was worried about it. We know about the van being driven away. We know about the keys being thrown up on top of the carport. We know about the whole thing. We just want to get—

"Q. [HENDERSON]: Somebody's trying to lay it on you as the trigger man.

"A. . . . you—I ain't I—I don't want to get involved in this, seriously. I been tryin as hard as I fuckin can to stay out of shit. I don't want to go back to that fucking jail because—

"Q. So tell us the truth.

"A. I ain't had nothin to do with this bullshit.

"Q. Tell us the truth, Sonny.

"Q. [STREED]: Tell us what happened.

"Q. [HENDERSON]: If you rode along with him, tell us. We know you were there.

"Q. [STREED]: It's not a question of you getting involved. You are already involved. We—

"A. I didn't want to have anything to do with it.

"Q. [HENDERSON]: OK.

"Q. [STREED]: Tell us about it. Tell us how it went down.

"A. And I'm going back to jail for another four or five years for a fucking robbery, bullshit. I don't want to. I ain't had nothing to do with it. It wasn't nothin to do with me.

"Q. [HENDERSON]: OK. Who did it?

"Q. [STREED] We're talking about murder.

"A. I don't know what the fuck Butch done and got off into.

"Q. [HENDERSON] Yes, you do. That's your problem."

tape would help Smith more than it would hurt him.[5] In the absence of additional evidence casting light on counsel's motivations, Smith has failed to meet his burden of demonstrating ineffective assistance of counsel. (See *People v. Pope, supra,* 23 Cal.3d at p. 425.)

Smith's final argument with respect to the taped statement involves counsel's failure to request excision of that portion of the tape containing Fleck's accusation that Smith fired the fatal shot. But the record reveals trial counsel's decision not to object was based on his evaluation that Fleck's statements were unintelligible. In any case, the trial judge was careful to admonish the jury to ". . . disregard anything they think they hear with respect to the tape that is being played as to the individual who is making this tape. Personally, I can't understand any of it. I doubt you could understand any of it. I see most of you are shaking your heads. [¶] But in the event you thought you did catch a word or two, please disregard it. We are not supposed to listen to the tape played of somebody else, just the tape played of the conversation with Mr. Smith." Having listened to the tape ourselves, we are of the view that such admonition cured any possible prejudice flowing from the failure to excise Fleck's statements.

## II

Smith next makes two claims of instructional error regarding the trial court's sua sponte duty to instruct under *People v. Flannel* (1979) 25 Cal.3d 668, 680-681 [160 Cal.Rptr. 84, 603 P.2d 1] and *People v. Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913]. (See also *People v. Wickersham* (1982) 32 Cal.3d 307 [185 Cal.Rptr. 436, 650 P.2d 311].) In *Flannel,* the court noted ". . . that even in the absence of a request, a trial court must instruct on the general principles of law governing the case, i.e., those principles relevant to the issues raised by the evidence, but need not instruct on specific points developed at trial. 'The most rational interpretation of the phrase "general principles of law governing the case" would seem to be as those principles of law *commonly* or closely and openly connected with the facts of the case before the court.'" (*Id.* at pp. 680-681, quoting *People v. Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116], fn. omitted.) In distinguishing the court's obligation to give requested instructions, the court in *Sedeno* stated that the sua sponte duty arises ". . . only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the

---

[5]For similar reasons, we do not think the trial counsel erred as a matter of law in allowing the jurors to receive copies of the transcript of Smith's statements.

defense is not inconsistent with the defendant's theory of the case."[6] (10 Cal.3d at p. 716.)

Relying on his testimony that he believed Fleck was merely seeking to get back the $75 which Hawthorne owed to Kruse, Smith contends the trial court should have instructed the jury that an honest but mistaken belief in the right to reclaim wrongfully withheld property negates the specific intent necessary to constitute a robbery. (See *People* v. *Butler* (1967) 65 Cal.2d 569, 573 [55 Cal.Rptr. 511, 421 P.2d 703].) Smith also points to his testimony regarding his belief that Fleck might shoot him if he didn't drive the van and argues the court erred in failing to instruct that an honest but unreasonable belief Smith was under duress might be sufficient to negate the specific intent to steal necessary to sustain the convictions for robbery and kidnapping for the purpose of robbery and the specific intent to commit the underlying felony necessary for application of the felony-murder rule. (Cf. *People* v. *Flannel, supra,* 25 Cal.3d at pp. 674-680.)

■ As to the mistaken belief in the right to reclaim the $75 Hawthorne owed to Kruse, we assume for the purposes of our discussion that the trial court was obligated to instruct sua sponte that such a belief, if possessed by Smith, could negate the specific intent to steal necessary to convict Smith of robbery.[7] We nevertheless cannot conclude such instructional error was prejudicial. Three witnesses testified to overhearing Smith and Fleck discuss plans to rob Hawthorne of several thousand dollars. Smith's own statement to police admitted Fleck mentioning such an amount. And, of course, Smith admitted the actual robbery proceeds were something greater than $390. Under such circumstances, we are of the view that any error was harmless beyond a reasonable doubt. (*Rose* v. *Clark* (1986) 478 U.S. 570, — [92 L.Ed.2d 460, 466-475, 106 S.Ct. 3101, 3103-3109]; see generally *People* v. *Garcia, supra,* 36 Cal.3d 539.)

Smith's alleged honest but unreasonable belief in duress is another matter. Although admitting the jury was properly instructed on the complete defense of duress (see CALJIC No. 4.40), Smith relies by analogy on *People* v.

---

[6]The distinction may have been clouded by language in *Flannel* suggesting that the court's duty to give *requested* instructions applies only where there is supporting evidence "substantial enough to merit consideration." (25 Cal.3d at p. 684, fn. 12.) A literal comparison of *Flannel* and *Sedeno* would suggest that, at least as to core instructions, the only time a defendant must request an instruction is when the instruction, although supported by substantial evidence, is inconsistent with his theory of the case.

[7]Such an assumption is not unreasonable in that the only factor mitigating Smith's admitted participation in the robbery was his belief as to the $75. The alleged duress only came into play *after* the commission of the robbery had begun. It would thus appear Smith was relying on his mistaken belief as his only defense to robbery. (See *People* v. *Sedeno, supra,* 10 Cal.3d at p. 716.)

*Flannel, supra,* 25 Cal.3d 668, which involved a claim that an honest but unreasonable belief by the defendant that his life was in danger negated the malice necessary to sustain defendant's murder conviction. The court reviewed past precedent discussing this so-called "imperfect self-defense" claim, but concluded that the obscurity of its legal basis would not support a conclusion that the trial court had a sua sponte duty to anticipate the *Flannel* holding. (*Id.* at pp. 681-682.) Here, although *Flannel* provides support for Smith's contention, that case does not hold an honest but unreasonable belief always negates a specific intent element of the crime charged.

■ We accept Smith's contention that an honest but unreasonable belief as to duress may negate the specific intent necessary for robbery and kidnapping for the purpose of robbery.[8] But for the reasons stated in *Flannel,* given the absence of precedent providing direct support, this proposition does not rise to the level of a sua sponte duty in this case.[9]

### III

Smith argues the jury should have been instructed pursuant to CALJIC Nos. 2.71.5 and 6.24 before they were allowed to consider hearsay statements made by Butch Fleck which tended to show Smith's knowledge of the plan to rob Hawthorne.[10] In order for the statements to have been

---

[8]As in *Flannel,* we are of the view that the discussion of the issue in this case gives rise to a sua sponte duty in future cases whenever the evidence suggests an honest belief, which if reasonable, would absolve the defendant of liability for the charged crime. Under such circumstances, an honest but *unreasonable* belief may negate the appropriate specific intent element.

[9]As we noted previously (*ante,* fn. 7) Smith's belief as to duress would not affect his robbery conviction since Fleck's alleged implied threats occurred while the robbery was in progress.

[10]CALJIC No. 2.71.5 reads as follows: "ADOPTIVE ADMISSION—SILENCE, FALSE OR EVASIVE REPLY TO ACCUSATION

"If you should find from the evidence that there was an occasion when the defendant, under conditions which reasonably afforded him an opportunity to reply, failed to make denial [or made false, evasive or contradictory statements,] in the face of an accusation, expressed directly to him or in his presence, charging him with the crime for which he now is on trial or tending to connect him with its commission, and if you should find that he heard the accusation and understood its nature; the circumstance of his silence [and conduct] on that occasion may be considered against him as indicating an admission that the accusation thus made was true. Evidence of such an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence [and conduct] of the accused in the face of it; and unless you should find that his conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement."

CALJIC No. 6.24 reads as follows: "DETERMINATION OF ADMISSIBILITY OF COCONSPIRATOR'S STATEMENTS

"Any evidence of a statement made by one alleged conspirator other than at this trial shall

considered, either on the theory of an adoptive admission or a statement in furtherance of a conspiracy, the jury was required to make certain preliminary findings, i.e., could defendant reasonably be expected to respond to the incriminating statements or were the statements made during and in furtherance of an ongoing conspiracy? The trial court erred in failing to so instruct the jury.

■   Although error, we think the court's failure was not prejudicial. With respect to statements made in the course of an ongoing conspiracy, there would appear to be more than abundant evidence indicating Smith and Fleck were co-conspirators planning a robbery at the time Fleck made the statements. In addition, Smith's own statements to Warfel and the sheriff's deputies indicated knowledge of the plan during the relevant period of time. A different result was not reasonably probable in the absence of the error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### IV

Smith testified at trial he had previously been convicted of two second degree burglaries involving uninhabited structures (see § 459) to establish his character for nonviolence and support his testimony that he believed Fleck's revolver was unloaded when they embarked on the robbery. The trial court instructed in general accord with CALJIC No. 2.23: "The fact that a witness has been convicted of a felony may be considered by you; however, only for the purpose of determining the credibility of that witness." Smith contends this instruction was erroneous since he was entitled to rely on the past felony convictions for the purpose of showing relatively good character.

■   Operation of the felony-murder rule, however, makes evidence of Smith's nonviolent intent generally irrelevant for all purposes other than the determination of special circumstances. There is no credible evidence suggesting Smith did not intend to rob Hawthorne. Once a robbery is established, the felony-murder rule makes any killing in the course of the robbery a murder, and section 189 mandates that such murder is of the first degree. Thus, even if the jury accepted the evidence of Smith's nonviolent

---

not be considered by you as against another alleged conspirator unless you shall first determine from other independent evidence that at the time the statement was made a conspiracy to commit a crime existed and unless you shall further determine that the statement was made while the person making the statement was participating in the conspiracy and before or during the time the person against whom it was offered was participating in the conspiracy and, finally, that such statement was made in furtherance of the objective of the conspiracy.

"The word 'statement' as used in this instruction includes any oral or written verbal expression or the nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression."

propensities,[11] the facts of this case demonstrate a first degree murder under current law. While the court erred in giving CALJIC No. 2.20, the error was not prejudicial. (See *People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

## V

As to the first degree murder charge against Smith, the jury was instructed on two alternative theories: premeditated first degree murder and first degree felony-murder. Smith contends the trial court erred in instructing on premeditated first degree murder since the evidence before the jury was legally insufficient to sustain a conviction on that theory. He insists where a jury is instructed on two legal theories, one of which is not supported by the evidence, and the reviewing court cannot tell which theory the jury utilized, the conviction must be reversed. (*People* v. *Green* (1980) 27 Cal.3d 1, 70-71 [164 Cal.Rptr. 1, 609 P.2d 468].)

■ Assuming we agree with Smith as to the sufficiency question, instructions on the unsupported premeditation theory were not prejudicial. The only evidence directly connecting Smith with the killing of Hawthorne was the testimony of Michelle Kruse to the effect that Smith was carrying the revolver shortly before the robbery and that Smith admitted to her he pulled the trigger.[12] But the jury clearly rejected Kruse's testimony in finding Smith did not personally use the weapon, so any instructional error as to that evidence is of no moment.

But Smith counters that the instructions were such that the jury could have found Smith aided and abetted Fleck's premeditated murder of Hawthorne.[13] To suggest such a conclusion, however, would be pure speculation. There was no evidence presented from which a jury could conclude that if Smith was not the triggerman, he nonetheless aided Fleck's preconceived

---

[11]The jury apparently did accept Smith's nonviolent character and believe his testimony as to his lack of involvement in the actual killing since they specifically found Smith did not personally use a firearm in the commission of the crime.

[12]Although we do not decide the issue, it seems unlikely this evidence alone was sufficient to enable a reasonable trier of fact to conclude beyond a reasonable doubt that Smith was guilty of premeditated murder. (See *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Although credibility is generally a question for the jury, Kruse's status as an accomplice made her testimony suspect (see § 1111; *People* v. *Gordon* (1973) 10 Cal.3d 460, 471 [110 Cal.Rptr. 906, 516 P.2d 298]) and she had numerous reasons to protect her boyfriend, Fleck. The testimony of Ron Thompson and David Wildasin corroborated Smith's testimony that Fleck was the motivating force behind the robbery. And with the exception of this alleged admission to Kruse, all of Smith's statements consistently denied any knowledge of or involvement with the killing itself.

[13]Aiding and abetting instructions (see CALJIC Nos. 3.00 and 3.01) were given and erroneously not limited to the robbery and kidnapping charges.

design knowing of Fleck's intent to kill Hawthorne. (Compare *People* v. *Houts* (1978) 86 Cal.App.3d 1012, 1019 [150 Cal.Rptr. 589].)

The *Green* rule is limited to situations in which the appellate court cannot discern which theory the jury in fact relied on, i.e., there must have been "ample reasons for the jury not to rely on the [legally sufficient] evidence. . . ." (27 Cal.3d at p. 71.) No such reasons appear in this case; we have no doubt the jury relied on a felony-murder theory. "To require reversal under these circumstances necessitates an assumption the jury premised its verdict on a legal theory on which . . . there was inadequate evidentiary support with only token argument, while ignoring the uncontradicted evidence of felony murder . . . ." (*People* v. *Munoz* (1984) 157 Cal.App.3d 999, 1010 [204 Cal.Rptr. 271].) The error of which Smith complains resulted in no miscarriage of justice. (Cal. Const., art. VI, § 13; *People* v. *Green, supra,* 27 Cal.3d at p. 74; *People* v. *Prantil* (1985) 169 Cal.App.3d 592, 606-610 [215 Cal.Rptr. 372].)

## VI

Smith next argues that the rationale of *People* v. *Dillon* (1983) 34 Cal.3d 441, 477 [194 Cal.Rptr. 390, 668 P.2d 697] should be applied to reduce his conviction from first to second degree murder. He asserts the punishment for first degree murder is disproportionately severe as applied to a nontrigerman such as himself who did not intend to kill and whose murder conviction is based solely on the felony-murder rule.

In *Dillon,* although rejecting defendant's argument that the felony-murder rule be judicially abolished, the Supreme Court explained how a defendant convicted of first degree murder on a felony-murder theory is a likely candidate to raise the contention that the punishment for his crime is disproportionately severe, thereby violating the constitutional prohibition against cruel and unusual punishment. (34 Cal.3d at p. 477.) ■ What emerges from the *Dillon* opinion and the later cases interpreting it is that in deciding whether a sentence for first degree murder is disproportionately severe as applied to a felony-murder defendant, the court must consider (1) the circumstances and nature of the offense and defendant's role in it, (2) the nature and background of the defendant, and (3) the punishments imposed on other participants in the crime. (*Id.,* at pp. 482-488; *People* v. *Leigh* (1985) 168 Cal.App.3d 217, 222-223 [214 Cal.Rptr. 61]; *People* v. *Harris* (1985) 175 Cal.App.3d 944, 960 [221 Cal.Rptr. 321]; see also *People* v. *Munoz, supra,* 157 Cal.App.3d 999, 1015-1016.)

As we pointed out in *People* v. *Munoz, supra,* ". . . *Dillon*'s application of a proportionality analysis to reduce a first degree felony-murder conviction

must be viewed as representing an exception rather than a general rule." (157 Cal.App.3d at p. 1014.) Our review of numerous post-*Dillon* decisions has failed to uncover a single case in which an appellate court has applied *Dillon* to reduce a first degree murder sentence. (But see *People v. Leigh, supra,* 168 Cal.App.3d at p. 224 (suggesting that, on remand, the trial court could effect such a reduction).) These include at least five cases in which the defendant, like Smith, was not the actual killer and apparently did not intend that the victim be killed. (See *People v. Kelly* (1986) 183 Cal.App.3d 1235 [228 Cal.Rptr. 681]; *People v. Rose* (1986) 182 Cal.App.3d 813 [227 Cal.Rptr. 570]; *People v. Williams* (1986) 180 Cal.App.3d 922 [225 Cal.Rptr. 842]; *People v. Almaraz* (1985) 173 Cal.App.3d 304 [218 Cal.Rptr. 888]; *People v. Laboa* (1984) 158 Cal.App.3d 115 [204 Cal.Rptr. 181]; see also *People v. Leigh, supra,* 168 Cal.App.3d 217.) These later cases seem to suggest that even though the causational nexus between a defendant's personal involvement in a criminal enterprise and a resultant killing is minimal or nonexistent, something more is required in terms of the second and third *Dillon* factors in order to justify a reduction in sentence.

In the present case, Smith's personal history and background as well as the sentence imposed on Butch Fleck do not demonstrate the disproportionality of Smith's punishment. In contrast to the 17-year-old defendant in *Dillon* who had no prior criminal record, Smith has an extensive criminal history beginning at age 16 which includes 4 burglary convictions. Moreover, Hawthorne's murder took place only 13 days after Smith was released from prison. Smith also admits a prior drug abuse problem. Significantly, none of the participants in the system who observed Smith (e.g., judge, jury, parole officer, probation officer) expressed any concern regarding the severity of the punishment. (See *People v. Laboa, supra,* 158 Cal.App.3d at p. 122.)

Focussing on the concept of proportionality, the Supreme Court in *Dillon* was struck by the fact that defendant's coparticipants in the robbery—equally subject to prosecution for murder by virtue of the felony-murder rule—received only "petty chastisements" for their conduct. "In short," according to *Dillon,* "defendant received the heaviest penalty provided by law while those jointly responsible with him received the lightest—the proverbial slap on the wrist." (34 Cal.3d at p. 488.) Smith, however, is in no position to make a similar argument. Butch Fleck pled guilty to first degree murder with a special circumstance finding in exchange for the prosecutor's agreement not to seek the death penalty. Thus Smith's sentence, which includes the possibility of parole, is in no sense disproportionate to Fleck's.

In sum, we can understand how a cursory reading of *Dillon*—a case involving a defendant who intentionally killed the victim—might logically

suggest that a first degree murder sentence is necessarily disproportionate when applied to a defendant who neither killed nor intended that a killing take place. (See especially 34 Cal.3d at pp. 494-499 (conc. opn. of Bird, C. J.).) Logic and the felony-murder rule, however, have never been well acquainted. (See, e.g., *People* v. *Phillips* (1966) 64 Cal.2d 574, 582-583 [51 Cal.Rptr. 225, 414 P.2d 353]; see generally *People* v. *Burroughs* (1984) 35 Cal.3d 824, 836-842 [201 Cal.Rptr. 319, 678 P.2d 894] (conc. opn. of Bird, C. J.).) It is clear, moreover, that *Dillon* has not been so interpreted and applied by the courts of appeal. Consistent with unbroken authority, then, we hold that Smith's sentence for first degree murder is not unconstitutionally disproportionate.

## VII

The Attorney General concedes Smith was not properly advised of his constitutional rights before admitting several prior convictions and prison terms within the meaning of section 667.5, subdivision (b). (See *In re Yurko* (1974) 10 Cal.3d 857, 863-864 [112 Cal.Rptr. 513, 519 P.2d 561].) The proper remedy under such circumstances is a remand to the trial court for a limited hearing on the truth of the priors. (*People* v. *Hickey* (1980) 109 Cal.App.3d 426, 437 [167 Cal.Rptr. 256].) Although such a hearing is largely academic in this case since the section 667.5 priors were stayed pursuant to section 654, we see no alternative disposition.[14]

## VIII

Finally we address the question whether *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] and *People* v. *Garcia, supra,* 36 Cal.3d 539 compel reversal of the special circumstances findings because the jury was not instructed it was required to determine that Smith intended to kill Hawthorne before it could find the special circumstance allegation true. Attempting to avoid *Garcia's* rule of per se reversal for *Carlos* error, the People contend the U.S. Supreme Court's recent decision in *Rose* v. *Clark, supra,* 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101] compels a reexamination of *Garcia* and application of the harmless error rule established in *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]. This issue is currently being considered by the California Supreme Court following the U.S. Supreme Court's remand of *People* v. *Hamilton* (1986) 41 Cal.3d 408 [221 Cal.Rptr. 902, 710 P.2d 981].

---

[14]Ideally, we might prefer a procedure where Smith's ability to request such a hearing would be postponed until such time as he is actually facing the possibility of serving a prison term for the section 667.5 enhancements.

Even assuming the People's argument is ultimately accepted by the California Supreme Court and a *Chapman* standard is applicable, reversal of the special circumstance finding is nonetheless clearly mandated. Smith presented substantial evidence that he did not intend to kill or intend to aid in killing Hawthorne. Indeed as we have noted, absent Michelle Kruse's testimony which was rejected by the jury, there was no evidence of Smith's intent to kill. (*Ante,* p. 681.)

Smith responds by arguing that not only must the special circumstance finding be set aside but retrial of the allegation is precluded by principles of double jeopardy and collateral estoppel. He asserts that because a premeditation theory was presented and argued to the jury, the prosecution had every incentive to prove Smith intended to kill Hawthorne but it failed to do so. Confronted with an identical contention in *Garcia,* however, the Supreme Court summarily rejected the defendant's argument: "We agree with the defendant that the evidence presented may be insufficient to support a finding of intent to kill, but think it unrealistic to assume that the prosecution, with a perfect case for proof of felony murder, necessarily presented all available evidence relating to intent. . . . We therefore reverse the special circumstance finding without directions, permitting the prosecution to seek retrial of that issue." (36 Cal.3d at pp. 557-558, fn. omitted.) On the basis of such binding precedent, we likewise must reject Smith's argument.

### DISPOSITION

The special circumstance finding is set aside. In all other respects, the judgment is affirmed. The matter is remanded to the superior court for further proceedings.

Work, J., and Butler, J., concurred.