[No. F013115. Fifth Dist. May 31, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
GRETTA JACOBS, Defendant and Appellant.

[No. F014531. Fifth Dist. May 31, 1991.]

In re GRETTA JACOBS on Habeas Corpus.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II.

**COUNSEL**

Carole Greeley, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungen, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Roger E. Venturi, Thomas F. Gede and Louis Vasquez, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BUCKLEY, J.**—Gretta Jacobs appeals a conviction after jury trial of a violation of Penal Code section 32 (accessory after a felony). Thereafter, defendant filed a petition for writ of habeas corpus, alleging ineffective assistance of counsel. We ordered consolidation of the appeal and petition for writ of habeas corpus. On appeal, Jacobs contends that the trial court committed reversible error by giving a *Flannel*[1] instruction to the jury regarding the testimony of the primary prosecution witness. We agree and will reverse.

## FACTS

On June 24, 1987, the Riverbank Police Department received a report of a gunshot at 6037 Coad Lane in Riverbank. Officer Sauls was dispatched to the scene and was informed that a small brown station wagon was seen leaving the area. Officer Sauls arrived at approximately 5:50 p.m. and was

---

[1]*People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1].

joined at the scene by Officer Bennett. The front door of the residence was closed but unlocked. As the officers entered the residence, they saw the victim, Jeff Stapley, on the floor in the hallway. He was dead. A spent rifle shell casing was found on the floor near the body.

Several neighbors of the Stapleys testified at trial. Their testimony was essentially the same, that immediately prior to the shooting Lisa was at the home, accompanied by a Black man and a Black woman and that the Black man had a rifle. After the shooting, the Black man, carrying a rifle, ran out of the house, the Black woman then came running out of the house and a White woman ran out of the house last, carrying a bag of clothing and a White child. All then drove away in a brown car. The Black man was later identified as Tony Jacobs, the Black woman as Gretta Jacobs and the White woman as Lisa Stapley.

Lisa Stapley testified that her husband had been beating her continually for four years and that she had been hospitalized twice after such beatings. She testified her husband was six feet, five inches tall and weighed two hundred sixty-five pounds. During the two-month period Lisa[2] knew Tony and Gretta Jacobs, her husband beat her approximately ten times. Lisa told Tony about the beatings. She often told people she wished her husband were dead, and she probably had said this to Tony.

Lisa testified to the events leading up to the shooting of her husband by Tony Jacobs. After her husband was shot, defendant grabbed her by the arm and pulled her over the body of Jeff Stapley, stating, "Shut the fuck up. My man's not going to prison because of you."

Lisa testified she did not remember leaving the house, but remembered being in the car and Tony driving away quickly. She testified that she was "scared" of defendant and had "no idea of what was going to happen next." Defendant told Tony he would have to get rid of the gun. Lisa made the statement that Tony's fingerprints would be on the gun even if they threw it in the canal. Tony drove the car to a canal bank and threw the gun in the canal.

After they arrived at the Jacobs residence, defendant indicated that they were going to have to come up with the same story. Defendant indicated they would say that Tony was in Utah with Lisa's brothers herding cattle at the time of the shooting and was never at the Stapley home. In addition, they would say that Lisa had gone with defendant to the Stapley home and argued with her husband, but that he was still alive when they left.

---

[2]The reference to certain persons by their first name is not intended to indicate disrespect but only to facilitate discussion and avoid confusion.

Lisa was told to say that Tony had never been to the Stapley home. Defendant told Tony to leave the house and visit a friend in Waterford, and Tony agreed. Lisa testified that while she was at the Jacobs residence, defendant was in control and that she would have done anything defendant said. Her husband was dead, she was with the Jacobs, and she was "scared to death."

During a telephone conversation with a neighbor, Lisa talked to Sergeant Bennett of the Riverbank Police Department and told him where she was. Approximately six police officers arrived at the Jacobs residence between 11:30 p.m. and midnight. Three of the police officers took Lisa into the garage to question her. Lisa told the police officers she and defendant had been to the Stapley home that afternoon, that Jeff had been alive when they left and that Tony had not been with them. Lisa admitted at trial that she had lied to the police, but that she did so because she was afraid of what defendant would do to her daughter Alisha if she did not tell the story defendant had told her to tell. Lisa could hear defendant's voice in the house and knew that if she did not stick to the story, she had her little girl to think about (who was in the house in a bedroom with the defendant).

Lisa and her daughter Alisha were then taken to the Riverbank police station where she was interviewed by Stanislaus County Sheriff's Deputy Michael Dulaney. The interview lasted approximately four hours. Lisa was very emotional and told Dulaney about her concern for the welfare of her child. Lisa was reunited with her child several times over the course of the interview. During the interview, Lisa admitted that she had lied at the Jacobs house and described the shooting. In the early morning hours of June 25, 1987, Lisa directed the officers to the canal where the rifle was recovered.

## DISCUSSION

In the consolidated appeal and writ petition, a panoply of issues is presented, ranging from allegations of prosecutorial misconduct to incompetence of counsel. Of the issues presented, only one is of significance here; its resolution compels us to reverse the judgment on appeal.

### I. *Misapplication of Flannel*

At the close of the prosecution's case, defendant's trial counsel made a Penal Code section 1118.1 motion for acquittal, which was denied. Counsel argued the only evidence before the court connecting defendant to

the charge was Lisa's testimony and a statement of Tony Jacobs.[3] ██
Counsel argued both Lisa and Tony were accomplices as a matter of law and
the evidence against defendant was uncorroborated since accomplices cannot
corroborate each other.[4] (*People* v. *Jehl* (1957) 150 Cal.App.2d 665, 668
[310 P.2d 495].)

The defendant has the burden of proof to establish that a witness is an
accomplice. (3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence
at Trial, § 1763, p. 1716; *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 962-963
[127 Cal.Rptr. 135, 544 P.2d 1335].) A preponderance of the evidence is the
applicable standard. (*Tewksbury* at p. 966.) If the prosecution introduces
evidence that establishes the accomplice status by a preponderance of the
evidence, the defendant's burden is satisfied. (*People* v. *Martinez* (1982) 132
Cal.App.3d 119, 130 [183 Cal.Rptr. 256].)

 The trial court, relying on *People* v. *Smith* (1986) 187 Cal.App.3d
666 [231 Cal.Rptr. 897], instructed the jury that if Lisa harbored an honest
though unreasonable belief of duress at the time she lied to the police, such
belief may negate the specific intent required to become an accessory under
Penal Code section 32.[5] The instruction given was based also on CALJIC
No. 4.40 and substituted the word "unreasonable" for the word "reason-
able."[6]

---

[3]The court admitted a statement from Tony to an investigator denying that he shot Stapley
but declaring that he heard Lisa and defendant arguing with the victim on the date in question.

[4]Penal Code section 1111 states that a conviction cannot be had upon the testimony of an
accomplice unless it is corroborated by such other evidence as shall tend to connect the
defendant with the commission of the offense. The section defines an accomplice as one who
is liable to prosecution for the identical offense charged against the defendant on trial in the
cause in which the testimony of the accomplice is given.

[5]Penal Code section 32 provides that every person who, after a felony has been committed,
harbors, conceals or aids a principal in such felony, with the intent that said principal may
avoid or escape from arrest, trial, conviction or punishment, having knowledge that said
principal has committed such felony or has been charged with such felony or convicted
thereof, is an accessory to such felony.

[6]The complete instruction was as follows: "A person is not guilty of a crime when she
engages in conduct, otherwise criminal, when acting under threats and menaces under the
following circumstances:

"1. Where the threats and menaces are such that they would cause a person to fear that
her life or the life of another would be in immediate danger if she did not engage in the
conduct charged, and

"2. If such person then believed that her life or the life of another was so endangered.

"This rule does not apply to threat[s], menaces and fear of future danger to her life or the
life of another.

"If you find that Lisa Stapley had an honest but unreasonable belief that she was acting
under threats and menaces of Defendant at the time she participated in the formulation of the
plan to aid Tony Jacobs and at the time she gave her statement to an officer of the Riverbank
Police Department while still at the Jacobs residence, such belief may negate the specific

In this context, the People, not surprisingly, contend that *Smith* was appropriately followed by the trial court. The People interpret *Smith* as a proper extension of the doctrine espoused by *Flannel.*

In *People* v. *Smith*, *supra*, 187 Cal.App.3d 666, the defendant agreed to participate with Fleck in a robbery. Fleck followed the robbery victim into a van and forced the victim at gunpoint into the back of the van. Fleck called to Smith and told him to drive the van. Smith testified he was scared that Fleck would shoot him if he did not comply. Smith drove the van at Fleck's direction to an isolated area. Fleck told Smith he was going to tie the victim up and leave him in the isolated area. After Fleck left the van with the victim, Smith heard a gunshot. He found Fleck standing over the victim with a gun in his hand. Smith was convicted after jury trial of robbery, kidnapping and first degree murder.

On appeal, Smith argued instructional error regarding the court's duty to instruct sua sponte under the case of *People* v. *Flannel*, *supra*, 25 Cal.3d 668, 680-681. Smith pointed to his testimony regarding his fear that Fleck might shoot him if he did not drive the van. Smith argued the court erred in failing to instruct that an honest but unreasonable belief that he was under duress might be sufficient to negate the specific intent necessary to convict Smith of robbery, kidnapping for the purpose of robbery and the specific intent to commit the underlying felony necessary for the application of the felony-murder rule. (*People* v. *Smith*, *supra*, 187 Cal.App.3d at p. 678.) The appellate court noted that in *Flannel*, the Supreme Court held that an honest but unreasonable belief by the defendant that his life was in danger negated the malice necessary to sustain a murder conviction. (*Id.* at pp. 678-679.) The court in *Smith* accepted the defendant's contention that an honest but unreasonable belief as to duress may negate the specific intent necessary for robbery and kidnapping for the purpose of robbery. However, given the absence of existing precedent providing direct support for Smith's contention, the trial court did not have a sua sponte duty to so instruct. In a footnote the appellate court stated,

"As in *Flannel*, we are of the view that the discussion of this issue in this case gives rise to a sua sponte duty in future cases whenever the evidence suggests an honest belief, which if reasonable, would absolve the defendant of liability for the charged crime. Under such circumstances, an honest but *unreasonable* belief may negate the appropriate specific intent element." (187 Cal.App.3d at p. 679, fn. 8.)

In *People* v. *Flannel*, *supra*, 25 Cal.3d 668, the Supreme Court held that a person's honest but unreasonable belief in the need to defend oneself against

---

intent she was required to have before becoming an accessory to the crime and if you find that such specific intent was negated, you may find she was not an accessory."

imminent danger negated the mental state of malice aforethought required for murder (reducing the crime to manslaughter). (At p. 674.)

The problem with the analysis given *Flannel* by *Smith* is that certain critical language in *Flannel* is overlooked (or not adhered to). In *Flannel*, the Supreme Court stated:

"To be exculpated on a theory of self-defense one must have an honest *and* reasonable belief in the need to defend. [Citations.] . . .

"This rule is not questioned here. Rather, the issue is whether a defender has committed murder or manslaughter when his belief, although honestly held, fails to meet the standard of a 'reasonable person.'" (*Flannel, supra,* 25 Cal.3d at pp. 674-675.)

*Flannel* did not change the existing law by its holding. It merely iterated what had always been the law in California, though seldom recognized and rarely applied. (*People v. Ogen* (1985) 168 Cal.App.3d 611, 622 [215 Cal.Rptr. 16].)

*Flannel* 's antecedents, as recognized in its opinion, are found in the cases of *People v. Wells* (1949) 33 Cal.2d 330 [202 P.2d 53]; *People v. Lewis* (1960) 186 Cal.App.2d 585 [9 Cal.Rptr. 263]; *People v. Best* (1936) 13 Cal.App.2d 606 [57 P.2d 168]; *Roads v. Superior Court* (1969) 275 Cal.App.2d 593 [80 Cal.Rptr. 169]; and dicta in *People v. Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913]. (25 Cal.3d at pp. 675-676.)

All of those cases examined the honest but unreasonable belief doctrine as applied to malice. All confined themselves to a determination of whether malice was or would have been properly negated (reducing murder to manslaughter) by the application of the doctrine. Although there may be instances where malice is required but self-defense is not implicated, the honest but unreasonable doctrine typically arises in that context. In fact, the *Flannel* rule is often called the right of "imperfect self-defense." (*People v. Otis* (1980) 111 Cal.App.3d 467, 472 [168 Cal.Rptr. 708].)

Following the issuance of the *Flannel* decision, numerous cases have adhered to the principles clearly set forth therein. (See, e.g., *People v. Wickersham* (1982) 32 Cal.3d 307, 328 [185 Cal.Rptr. 436, 650 P.2d 311]; *People v. McKelvy* (1987) 194 Cal.App.3d 694, 701 [239 Cal.Rptr. 782]; *People v. Subielski* (1985) 169 Cal.App.3d 563, 567 [211 Cal.Rptr. 579]; *Walker v. Superior Court* (1980) 107 Cal.App.3d 884, 890 [166 Cal.Rptr. 209].)

In *People v. Subielski, supra,* 169 Cal.App.3d at page 567, the Sixth Appellate District found no authority to support defendant's contention that

an honest but unreasonable belief of injury could negate the specific intent to commit robbery. The court noted that there was no evidence to indicate his *life* was in danger and declined "to elevate this new theory, with no supporting precedent to do so, to the status of a general principle of law . . . ."

In *People* v. *McKelvy*, *supra*, 194 Cal.App.3d 694, the First Appellate District found that the purpose of the *Flannel* instruction is to *mitigate*, rather than to absolve the defendant of criminal responsibility. (*Id.* at p. 703.) The First District expressly disagreed with the conclusion of the Fourth District in *Smith*, which approved of the negation of specific intent by an honest but unreasonable belief. The First District stated: "While we agree that the unreasonable belief may negate malice, we disagree with *Smith* to the extent that it requires use of the unreasonable belief instruction where it would serve to acquit the defendant." (*Id.* at p. 703, fn. 5.) No other reported case has followed *Smith* in holding that specific intent may be negated by an honest but unreasonable belief.

We recently held that *Flannel* has no application to an enhancement under Penal Code section 12022.7. (*People* v. *Goins* (1991) 228 Cal.App.3d 511 [279 Cal.Rptr. 42].) We stated that an honest but unreasonable belief was not inimical to specific intent. "One could have an honest but unreasonable belief in the necessity of self-defense and still have the specific intent to inflict great bodily injury." (*Id.* at p. 517.)

Finally, and most importantly, a defendant has no legitimate interest in complete exculpation when acting outside the range of reasonable behavior. (*Flannel*, *supra*, 25 Cal.3d at p. 680.) Likewise, Lisa could not be exonerated from responsibility as an accomplice with an honest but unreasonable belief that her actions were required. It was error to instruct the jury that she could be so exonerated.

*Was the error harmless?*

Having concluded the trial court erred when it instructed pursuant to *People* v. *Smith*, *supra*, 187 Cal.App.3d 666, we must next determine whether such error was prejudicial. Defendant argues that it was. The People contend the jury was properly instructed with CALJIC No. 3.14 which gives the requisite specific intent necessary for an accomplice and furthermore that there was no evidence Lisa had the specific intent to aid Tony Jacobs avoid arrest or conviction. Therefore, if error was committed, it was harmless.

The California Constitution, article VI, section 13 provides,

"No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

The effect of this provision is to eliminate any presumption of injury from error and to require that the appellate court examine the evidence to determine whether the error did in fact prejudice the defendant. Thus, reversible error is a relative concept, and whether a slight or gross error is ground for reversal depends on the circumstances of each case. (6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Reversible Error, § 3276, p. 4042; *People* v. *O'Bryan* (1913) 165 Cal. 55, 63 [130 P. 1042]; *People* v. *Watson* (1956) 46 Cal.2d 818, 834 [299 P.2d 243].)

In *Chapman* v. *California* (1967) 386 U.S. 18, 26 [17 L.Ed.2d 705, 711-712, 87 S.Ct. 824, 24 A.L.R.3d 1065], the United States Supreme Court held that under the facts of the case, the prosecutor's extensive comments about the defendant's failure to testify and the judge's instruction continually brought improper inferences before the jury. The court held that it was impossible for it to say that the state had demonstrated, beyond a reasonable doubt, that the prosecutor's comment and the trial judge's instruction did not contribute to the petitioner's conviction. The court thus reversed and remanded the case.

In *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101], the Supreme Court applied the *Chapman* harmless beyond a reasonable doubt test to instructional error. In *Rose*, an instruction given impermissibly shifted the burden of proof as to malice. Such an instruction was found to violate due process. The case was remanded to the United States Court of Appeals to apply the *Chapman* test to the facts of the case. (At p. 584 [92 L.Ed.2d at pp. 474-475].)

In *People* v. *Lee* (1987) 43 Cal.3d 666 [238 Cal.Rptr. 406, 738 P.2d 752], conflicting instructions were given on the issue of specific intent. The Supreme Court held that the trial court erred in giving conflicting instructions on the issue of specific intent to kill as it related to an attempted murder charge. The court held that although the instructions were constitutionally infirm, the error was harmless beyond a reasonable doubt. The court concluded that a reversal per se standard was inappropriate in an attempted murder case where conflicting specific intent and implied malice instructions had been given and that the *Chapman* test should be employed in such cases. (At p. 678.)

In *People* v. *Rogers* (1943) 22 Cal.2d 787 [141 P.2d 722], the court noted that an error in an instruction which ordinarily would not prejudice the rights of a defendant may justify a reversal of the judgment where the jury is misdirected or misled upon an issue vital to the defense and the evidence does not point unerringly to the guilt of the person accused. "If it is probable that in the absence of a misleading instruction the jury would not have returned the verdict complained of, then there has been a miscarriage of justice within the meaning of the constitutional provision. [Citations.]" (*Id.* at p. 807.)

In *People* v. *Dail* (1943) 22 Cal.2d 642 [140 P.2d 828], the primary prosecution witnesses were accomplices. The court instructed the jury that the credibility of accomplice witnesses was to be judged by the same standard as other witnesses. However, the court also gave an instruction stating the statutory provision that the testimony of an accomplice should be viewed with distrust. Since the chief prosecuting witnesses were accomplices, it was of the utmost importance the jury be correctly advised as to the standards by which such testimony was to be weighed. No attempt was made to relate to or explain the inconsistency. Articulating the standard of whether the error affected "the substantial rights of the party complaining against it," the court concluded that the error resulted in a miscarriage of justice within the meaning of the California Constitution. (*Id.* at p. 659.)

■■■ Applying the principles of the cases cited above to the circumstances of the present case, can it be said that the instruction based on *People* v. *Smith*, *supra*, 187 Cal.App.3d 666, was harmless beyond a reasonable doubt? The only evidence supporting defendant's conviction of a violation of Penal Code section 32 came from Lisa Stapley.

The prosecutor twice argued that the jury did not have to find Lisa had a reasonable fear of harm. He also argued there was no evidence before the jury that Lisa Stapley was an accomplice. However, the record indicates that Lisa Stapley was the last person out of the house and into the brown Volvo, implying that she went with the Jacobses willingly. She stayed with defendant and Tony Jacobs for the rest of the evening. There was no evidence that either Tony or defendant threatened her personally. With seven police officers in the Jacobs home, Lisa Stapley lied to the police about her actions earlier in the evening. Lisa Stapley had continually been abused by her husband and had made statements that she wished he were dead. Based on this record, we conclude that the evidence was in conflict as to Lisa Stapley's status as an accomplice. The finding of the jury as to Lisa's status was critical to the defense.

If the jury had found that she was an accomplice, assuming there was no corroborating evidence, they would have been compelled to acquit. (Pen.

Code, § 1111.) Lisa's explanation that although seven police officers were in the home, she continued to fear for her child's safety could have been construed by the jury as unreasonable under the circumstances with a resultant determination that she was an accomplice. The instruction was prejudicial and cannot be held to be error harmless beyond a reasonable doubt.

## II. *Duress Was a Question of Fact for the Jury**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Given our conclusion, all other issues raised on appeal and by petition for writ of habeas corpus are rendered moot.

### DISPOSITION

The judgment is reversed.

Dibiaso, Acting P. J., and Thaxter, J., concurred.

---

*See footnote, *ante*, page 1337.