102 Cal.Rptr.2d 245 (2001)
85 Cal.App.4th 565
The PEOPLE, Plaintiff and Respondent,
v.
Robert Neal ANDERSON, Defendant and Appellant.
No. A087698.
Court of Appeal, First District, Division Two.
December 15, 2000.
Review Granted March 28, 2001.
*246 First District Appellate Project, Neoma Doris Kenwood, Berkeley, Attorney for Appellant.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, Moona Nandi, Deputy Attorney General, Attorneys for Respondent.
Certified for Partial Publication.[*]
RUVOLO, J.
Appellant Robert Neal Anderson was convicted of first degree murder and kidnapping of Margaret Armstrong (Pen. Code, §§ 187, 207, subd. (a)).[1] On appeal from the judgment he contends: (1) the trial court erred by refusing to instruct on duress as a defense to the murder charge; (2) trial counsel was ineffective for failing to request an instruction on imperfect duress; and (3) the trial court erred by refusing to give a unanimity instruction as to the murder charge. In the published portion of this opinion, we conclude that Penal Code section 26, which makes the defense of duress unavailable for a crime "punishable by death" applies to all charges of first degree murder.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A. Prosecution Case

Sometime in the spring of 1994, appellant and his wife Christiane met Ron and Deborah Kiern and their two children, Elizabeth and Richard, at a swap meet in Joshua Tree, California. Both couples made their living traveling with their children to swap meets at various locations to sell their merchandise. The victim, Margaret Armstrong, lived in Joshua Tree with her husband Bill and sometimes shopped at the swap meet. She befriended the Kierns and Andersons during their stay.
The Andersons had an 18-foot motor-home in which they traveled and lived. They also had a pop-up tent trailer out of which they sold their merchandise. During the month or so that they were in Joshua Tree, the Andersons parked their motorhome outside the residence the Kierns were renting.
The Andersons left Joshua Tree in June 1994 and drove north to a camp area near Eureka called the south jetty. Sometime after that, the Kierns moved in temporarily with Margaret and her husband Bill. At some point, Margaret told Deborah Kiern that the Kierns' live-in babysitter had been molesting Deborah's daughter Elizabeth. The babysitter was prosecuted, and Margaret *247 was supportive of the Kierns during the ordeal.
Deborah Kiern wrote a letter to Christiane Anderson, who was still camping at the south jetty, and told her about the molestation of her daughter. Christiane wrote back and invited the Kierns to come visit them at south jetty. The Kierns invited the Armstrongs to come along. Bill could not go, but he encouraged Margaret to go with them. The Kierns left some of their property at the Armstrong home and traveled north with Margaret Armstrong accompanying them. During the trip north, Margaret called her husband almost every day. They arrived at south jetty around the end of July or early August.
The south jetty was described by a retired Humboldt County Sheriff as a lawless community where people lived in tents, campers, motor homes and cardboard shanties. There was no power, running water, or restroom facilities. The south jetty consisted of a three-mile stretch of road running from the south of the jetty to the north, which was bisected by another road running from the ocean side to the jetty side, called Hell's Lane.
Upon arriving at the south jetty, the Kierns and Margaret Armstrong shared the Andersons' campsite, with the Kierns living in a large tent and Margaret in a one-person pup tent. After a few weeks, Margaret left and stayed at another camp. Margaret made a frantic phone call to her husband after she had been at south jetty about two weeks. She told him that Ron Kiern wanted to come to Joshua Tree and pick up his belongings but leave her at the camp with his wife and children. Margaret said she did not want to stay and wanted to return home.
About two days later, Margaret called her husband and reported that she was being threatened by the Kierns. Bill Armstrong told her he would send her a Western Union money order to purchase a bus ticket to return home. He did so and learned that the money had been picked up. Evidence was presented that Margaret was the person who picked it up on August 29, 1994.
After Margaret had moved out of the Anderson/Kiern encampment, the Kierns' daughter Elizabeth reported that Margaret had tried to molest her. Another camper, Becky, who lived across the road from the Anderson/Kiern campsite, also suspected Margaret of molesting one of her children.
When Margaret returned to the Anderson/Kiern campsite to pick up her things, she was confronted by appellant, Ron, and Becky. Becky arrived with a gun in her hand, but Becky's partner Mel took the gun away from her. Christiane and Deborah gathered up their children and Becky's children and took them to an abandoned bus nearby. On her way to the bus, Christiane saw Becky dragging Margaret to the "Back Forty" (a field of sagebrush behind the encampment). Margaret was kicking and screaming and her arms were over her head with her wrists apparently bound together. Ron and appellant were also with them. It sounded like Margaret was being beaten. At some point Becky returned and told Deborah to go to where they had Margaret. Christiane then returned to her motorhome.
Deborah found Margaret with Ron, appellant, and another woman who lived in the area. Margaret was naked, had been beaten, and her hands were bound in front of her with duct tape. Deborah hit Margaret a couple of times for what she had done to her daughter. Ron testified that he and Becky had hit Margaret before Deborah arrived. They put duct tape over Margaret's mouth, tied her to a bush, and left.
Christiane testified that appellant returned to their motorhome about noon or 1:00 p.m. and told her that they had beaten Margaret, tied her up in the Back Forty, and there was no way she could get away. Sometime later, the parties discussed what to do with Margaret. According to Christiane and Ron, Ron wanted to let Margaret *248 go, but appellant refused because he was afraid she would report them to the police for beating her.
Later that afternoon, appellant and Ron went in the Kierns' car to buy supplies. On their way back to camp, appellant and Ron found Margaret running naked down the street, heading out of the jetty. They grabbed her and put her in the backseat on the floor. Ron held Margaret down so no one would see her while appellant drove. During the drive, appellant told Ron that Margaret could not leave the jetty. Both Christiane and Deborah saw the men return with Margaret in the back seat, still alive.
The men put Margaret in her sleeping bag and wrapped the bag with duct tape. Ron and appellant put Margaret in the trunk of the Kierns' car; Margaret was screaming. Ron, Deborah and Christiane all testified that appellant picked up a large rock and brought it to the trunk. Deborah and Christiane saw appellant hand the rock to Ron. Deborah turned away at this point, but heard a thud followed by a bounce, after which Margaret was quiet. Christiane saw Ron bring the rock down in the trunk where Margaret's head was and then heard nothing more from Margaret.
Ron testified that appellant said Margaret had to die, but Ron responded that they should let her go. According to Ron, they both put Margaret in the trunk, and then appellant dropped a small boulder on Margaret's head, after which she was still. Appellant picked up the rock again, handed it to Ron, and told him to drop it on Margaret or something would happen to his family. Ron dropped the rock in the trunk, but he believed it missed Margaret. Ron recalled telling Detective Freeman after his arrest in 1998 that he did in fact drop the rock on Margaret while she was still moving, but he said at trial that he was mistaken earlier. Ron and appellant went into the motorhome and commented to Deborah and Christiane that Margaret was dead.
Mel Snow, who lived nearby with Becky Simons and their five children, testified that he heard Margaret screaming, looked over and saw appellant and Ron put Margaret in the trunk. Mel heard Margaret squealing, saw appellant pick up a rock and then saw his hands free, but he could not see what appellant did with the rock. After appellant's hands were free, Margaret's squealing stopped. Around that time, someone from the Anderson/Kiern camp asked Mel where they could hide a body, and Mel said to go out on Highway 36.
Appellant told Christiane that he and Ron collected Margaret's things and buried them in the Back Forty. After dark, Ron and appellant left in the car and were gone about three hours. Ron testified that they drove up Highway 36, placed Margaret's body down the edge of a ravine, and covered it with brush. He did not know the exact location. Christiane testified that appellant told her he and Ron had rolled Margaret's body down a ravine. She also recalled Ron mentioning that he had stepped on Margaret's neck until it crunched to ensure she was dead before putting her in the ravine, but Ron denied this.
Christiane and Deborah both recalled appellant making remarks about not taking the blame for the murder. Within two days of the attack on Margaret, the Andersons and Kierns left the south jetty together. Before leaving, they agreed not to discuss the incident anymore and that if questioned, they would say Margaret had packed her things and taken a bus home.
Bill Armstrong reported his wife missing around September 1, 1994, when she did not return home on the bus as arranged. Detective Lonnie Lawson was assigned to investigate the missing person report. He went out to south jetty and tried to speak with a number of residents, but received no cooperation. He returned to the jetty on November 1, 1995, after receiving information from another deputy *249 about a homicide victim named Margie. He excavated a site about 200 feet from Hell's Lane and uncovered items that were identified by Bill Armstrong as belonging to Margaret.
In March 1996, Detective Freeman found the Kierns and appellant in Apache Junction, Arizona, and interviewed them one at a time. Freeman spoke to Christiane in Phoenix the day after he had spoken to appellant and the Kierns. She was reluctant to speak and expressed fear of being killed if she told the truth.
Appellant and Ron were arrested in February 1998. After the arrest, Freeman interviewed Deborah who, after speaking with an attorney, told the truth about what had happened and encouraged Ron to do the same. Ron subsequently contacted Freeman. Initially, Ron put all the blame on appellant, but after Freeman confronted him with what he knew, Ron admitted his own involvement. Ron pleaded guilty to second degree murder in exchange for his truthful testimony. Ron accompanied Freeman to various locations near Highway 36 to search for Margaret's body, but they never found it.

B. Defense Case

Appellant testified in his own behalf. He said Christiane told him about Elizabeth's molestation the night before Margaret's murder. The next morning, Ron asked appellant to help him find and confront Margaret. Later that morning Margaret showed up, and there was a confrontation involving her, Ron and Becky. Becky eventually dragged Margaret outside and was beating her while Deborah watched. Later, Deborah joined Becky and Ron in attacking Margaret and dragging her to the back of the camp. Appellant got disgusted and walked away. Ron then met up with appellant and smoked a joint with him. Appellant told Ron Margaret had had enough and they should let her go, suggesting they drop her off at the hospital and leave town. Ron refused.
Appellant suggested he and Ron take a ride to talk. Appellant almost had Ron convinced to take Margaret to the hospital and to leave town when they saw Margaret, beaten and naked, walking down the road. Appellant stopped the car, and Ron grabbed Margaret and threw her in the back seat. Ron said to drive back to camp, which appellant did.
Back at camp, Ron put Margaret in the sleeping bag and bound it with duct tape. Appellant opened the trunk at Ron's instruction, and Ron put Margaret inside. Ron pointed to a rock and told appellant to retrieve it. Appellant told him he was out of his mind, but Ron said, "Give me the rock or I'll beat the shit out of you." Appellant complied because Ron was bigger than he and appellant was not in shape to fight. When asked what he thought Ron would have done if he had said no, appellant replied: "Punch me out, break my back, break my neck. Who knows." The rock appellant picked up was the size of a cantaloupe. Ron hit Margaret over the head with the rock two or three times. Deborah was standing there yelling, "Kill the bitch."
Afterward, Ron disappeared, and appellant went in the motorhome and told Christiane the Kierns were crazy and they should get away from them. Christiane said the Kierns would accompany them to Apache Junction and then go their own way. Ron returned about 20 or 30 minutes later and said, "Let's go." They left in Ron's car, with Ron giving directions. At some point Ron told appellant to pull over. Ron opened the trunk; Margaret was still moaning and moving around. Appellant said, "[L]et's take her to the hospital," but Ron told him to shut up and called him a wimp. Appellant got back in the car to smoke a cigarette, saying he couldn't handle this. A few minutes later, Ron slammed the trunk closed, got in the car, and announced, "She's dead now. I stomped on her neck and broke it." On their way back, they were stopped by a *250 California Highway Patrol officer. Ron told appellant to keep his mouth shut, so he did.
When they got back to camp, Christiane said a cop had come by looking for Margaret, that she told him Margaret had taken off hitchhiking or on a bus, and that they should all stick to that story. They left town the next morning. Appellant heard that Margaret's things were buried or burned, but he did not participate.
Appellant denied telling Ron that Margaret needed to be killed. He admitted, however, telling Ron he would not go down for the murder for him. Appellant testified that Ron was the one who said several times that they could not release Margaret because she would go to the police.
When Detective Freeman came by Apache Junction in 1996, appellant had just stopped by the Kierns' stand to collect money for some items they sold for him. Appellant said he lied to Freeman then because he was afraid of Ron.

II.

ARGUMENT

A. Refusal to Instruct on Duress

Appellant contends the trial court committed reversible error when it refused to instruct the jury on duress as a defense to the murder charge. The defense had requested the court to give the following modified version of CALJIC No. 4.40: "A person is not guilty of a crime when he engages in conduct, otherwise criminal, when acting under threats and menaces under the following circumstances: [¶] 1. Where the threats and menaces are such that they would cause a reasonable person to fear that his life would be in immediate danger if he did not engage in the conduct charged, and [¶] 2. If this person then believed that his life was so endangered. [¶] This rule does not apply to threats, menaces, and fear of future danger to his life."
The proposed instruction is based upon section 26, which states in pertinent part: "All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] . . . Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."
The prosecution argued against the instruction on the ground that this was a crime punishable with death because it could have been charged as a capital case. The prosecution also argued that the facts did not support a claim that appellant feared for his life. Defense counsel countered that since the state chose not to charge the offense as a capital crime, it was not punishable with death, and therefore did not fit the exception to the duress defense. Defense counsel also argued there was evidentiary support that appellant feared his life was in immediate danger in that he feared Ron Kiern would break his neck or back, thus inflicting possible deadly injury.
The trial court declined to give the instruction, apparently on both of the grounds argued by the prosecution. It did agree, however, to instruct on duress as a defense to the kidnapping charge and gave a modified version of CALJIC 4.40 limiting the defense to crimes other than murder.
Appellant argues that the trial court incorrectly construed section 26's exception for crimes punishable with death. Appellant asserts that the correct interpretation of the exception is that it applies only when the murder is charged as a capital offense. Section 26 states that the duress defense is available in all cases "unless the crime be punishable with death." Appellant maintains that the language "be punishable" refers to the penalty to be imposed on the crime as charged, not the potential penalty that could have been charged. Appellant urges the validity of his interpretation under the literal language of the statute as well as under *251 the principle that a penal statute is to be construed as favorably to the defendant as its language and circumstances of its application permit. (See Keeler v. Superior Court (1970) 2 Cal.3d 619, 631, 87 Cal. Rptr. 481, 470 P.2d 617; People v. Belmontes (1983) 34 Cal.3d 335, 345, 193 Cal. Rptr. 882, 667 P.2d 686.)
Respondent proffers a different interpretation, maintaining that the language "punishable with death" requires only that the crime simply have the potential of being punishable by death and that this interpretation is equally as reasonable as that urged by appellant. Moreover, respondent asserts that its interpretation is supported by the legislative history of the statute, observing that the "rule of lenity" (i.e., that ambiguities in a penal statute are to be resolved in favor of the accused) must give way when the ambiguity in the language can be resolved by looking to the policy behind the statute and its meaning when enacted. (People v. Lamb (1999) 76 Cal.App.4th 664, 678, 90 Cal.Rptr.2d 565.)
The defense of duress is derived from Anglo-American common law, as is the disallowance of it with regard to murder. (Dressier, Exegesis of the Law of Duress: Justifying the Excuse and Searching for its Proper Limits (1989) 62 So.Cal.L.Rev. 1331, 1370 (hereafter Law of Duress).) "The rationale of the defense of duress is that, for reasons of social policy, it is better that the defendant, faced with a choice of evils, choose to do the lesser evil (violate the criminal law) in order to avoid the greater evil threatened by the other person." (1 LaFave & Scott, Substantive Criminal Law (1986) § 5.3, p. 614.) As to murder, however, the nearly unbroken tradition of the common law is that "duress never excuses murder, that the person [being] threatened with his own demise `ought rather to die himself, than escape by the murder of an innocent.'" (Law of Duress, supra, at p. 1370.)
The language barring the defense of duress when the crime "be punishable with death" has been in section 26 since the adoption of the Penal Code in 1872. At that time all first degree murders were punishable by death. (1872 Pen.Code, § 190.) The evident purpose of the language barring the defense of duress when "the crime be punishable with death" was to make the defense inapplicable to all first degree murder charges inasmuch as that was the only crime punishable with death. Therefore, the defense of duress was categorically unavailable in all first degree murder cases, and the language has remained unchanged ever since.
What has changed, however, is the applicability of the death penalty in California. In 1874, the murder statute was amended to provide that all first degree murders were punishable by death or life imprisonment at the jury's discretion. (Amendments to the Codes, 1873-1874, p. 457.) That discretion was absolute. (See People v. Green (1956) 47 Cal.2d 209, 218-232, 302 P.2d 307.) While the death penalty has been applied to other crimes in the past (e.g., People v. Chessman (1959) 52 Cal.2d 467, 341 P.2d 679 [aggravated kidnapping]), currently, as in 1872, only first degree murder carries a possible capital sentence.[2]
The question, then, is whether the intent of the Legislature was to exclude the defense of duress in all cases in which first degree murder has been charged, or was it intended to be prohibited only in cases where the prosecution chooses to charge the death penalty? The case law cited by the parties does not answer this question.
The court in People v. Martin (1910) 13 Cal.App. 96, 102-103, 108 P. 1034 noted *252 that duress was not available at common law as a defense to killing an innocent person, but it did not interpret the language at issue here and, moreover, held that duress was not available under the facts presented because the person was not in imminent danger. In People v. Petro (1936) 13 Cal.App.2d 245, 247-248, 56 P.2d 984, the appellate court rejected a claim that the trial court erred in instructing that duress was not a defense to the charge of first degree murder which carried a penalty of death or life imprisonment. People v. Pena (1983) 197 Cal.Rptr. 264, 149 Cal.App.3d Supp. 14, 22 merely recites that duress is not a defense to murder but does not construe section 26. People v. Son (2000) 79 Cal.App.4th 224, 232-233, 93 Cal.Rptr.2d 871 (review den.) also merely states that duress is not a defense to murder, citing Petro and Pena, without construing the language of section 26. In People v. Barker (1979) 94 Cal. App.3d 321, 156 Cal.Rptr. 407, the court declined to reach the merits of the argument regarding the applicability of section 26 because the defendant discredited his own testimony of coercion. (Id. at p. 333, 156 Cal.Rptr. 407.) Finally, in People v. Moran (1974) 39 Cal.App.3d 398, 416-417, 114 Cal.Rptr. 413, the court, in dicta and with no further analysis, said that section 26's exception for capital crimes was rendered meaningless by the abolition of the death penalty.
In our view, while case precedent provides no clear answer to the proper interpretation of section 26's exclusion of duress when the crime "be punishable with death," history and logic compel the answer. The original intent of the Legislature was to make the defense of duress unavailable in all first degree murder cases. Because all persons convicted of first degree murders in 1872 were given the death penalty, the reference to crimes "punishable with death" was synonymous with the statutorily defined crime of first degree murder. Over intervening years the Legislature enacted laws providing a criminal defendant with an alternative sentence of life imprisonment at the discretion of the jury in order to conform our state's law to the federal constitutional proscription on cruel and unusual punishment. (People v. Jackson (1980) 28 Cal.3d 264, 168 Cal.Rptr. 603, 618 P.2d 149; People v. Rodriguez (1986) 42 Cal.3d 730, 230 Cal. Rptr. 667, 726 P.2d 113.) However, that change did not evince an intent by the Legislature to relax the historic limitation on the duress defense, thereby allowing its use in first degree murder cases in which the prosecution does not seek the death penalty.[3]
Perhaps even more importantly, the punishment is largely irrelevant to the reason for excluding duress as a defense to first degree murder. As we have pointed out, the purpose in making the defense of duress unavailable for first degree murder is the recognition in common law that premeditated and intentional killing of another human being is not justified because the defendant feels threatened with death by another. Essentially, the law acknowledges by this limitation that no amount of duress can justify the deliberate and planned killing of another. This moral imperative applies regardless of whether the first degree murder is prosecuted as a capital crime or not. The murder in either case was premeditated and intentional, and inimical to the moral principles that support the defense.
We also believe a rule making the availability of the duress defense turn on the manner in which prosecutorial discretion is exercised is potentially pernicious, and may do an unnecessary disservice to criminal defendants. The decision of whether *253 to seek the death penalty for first degree murder should not be encumbered by tactical considerations, such as blocking anticipated defenses. The charging decision must be governed by more sagacious considerations than whether the punishment charged will deprive a defendant of a defense to the crime.
For all of these reasons we reject appellant's contention that he was entitled to have the jury instructed on the defense of duress as to the first degree murder charge. Even were we to accept appellant's argument, however, we would find no error in the trial court's refusal to instruct because we conclude that appellant failed to present sufficient evidence to warrant a duress instruction.
The court is required to instruct on a requested defense if there is substantial evidence to support it. Substantial evidence is evidence from which a jury reasonably could conclude that the particular facts underlying the instruction exist. (People v. Flannel (1979) 25 Cal.3d 668, 685-686, 160 Cal.Rptr. 84, 603 P.2d 1.) The defense of duress requires evidence that the defendant acted upon an actual and reasonable belief that his life was presently and immediately endangered if he refused to participate. (People v. Quinlan (1970) 8 Cal.App.3d 1063, 1068, 88 Cal.Rptr. 125; People v. Manson (1976) 61 Cal.App.3d 102, 206, 132 Cal.Rptr. 265.)
Appellant's claim of duress is supported by his testimony that Ron said, "Give me the rock or I'll beat the shit out of you." Appellant testified that he complied because Ron was bigger than he, and he was in no shape to fight him. Appellant said he interpreted Ron's statement as a threat to "[p]unch me out, break my back, break my neck. Who knows." It is clear that appellant feared Ron might beat him up, but it is not clear that he feared Ron would kill him. Nor is it clear that such a fear would have been reasonable. Even if appellant actually believed Ron would kill him, such a belief does not appear reasonable in light of the wording of the threat and the surrounding circumstances. There was no history of violence between the two men, and the threat was made in front of several other people. Moreover, Ron did not actually need appellant's help; he could have retrieved the rock himself. A belief that Ron would have killed him for refusing to get the rock does not appear reasonable.
We recognize that the trial court gave a duress instruction as to the kidnapping charge. We are not persuaded, however, that the evidence was sufficient to warrant the instruction. Appellant concedes that the evidentiary support for his fear was greater at the time of the homicide than at the time of the kidnapping, and we found that evidence insufficient. We assume that the trial court gave the instruction out of an abundance of caution; it would not have been error to have refused the instruction, which the jury rejected in any event.

B.-C.[**]

III.

DISPOSITION
The judgment is affirmed.
KLINE, P.J., and HAERLE, J., concur.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.B and II.C.
[1] Unless otherwise indicated, all statutory references are to the Penal Code.
[2] The common law approach to duress was substantially modified by the American Law Institute in its drafting of the Model Penal Code. Its version of the defense of duress does not exclude applying it to a murder charge. Although some states have adopted this version of the defense, many states have not and continue to disallow it as to murder. (Law of Duress, supra, 62 So.Cal.L.Rev. at pp. 1343-1347.) Throughout these debates, the California law has remained unchanged since the adoption of the Penal Code in 1872.
[3] Appellant argues that the crime of first degree murder does not become "punishable with death" until it is charged as a capital crime by the prosecutor. Yet, using appellant's reasoning, even then first degree murder is not "punishable with death," for that event does not arise until after completion of the guilt phase. (§ 190.1.) Such a construction would be anomalous indeed.
[**] See footnote *, ante.