107 Cal.Rptr.2d 552 (2001)
89 Cal.App.4th 806
The PEOPLE, Plaintiff and Respondent,
v.
Monica Mary CHAVEZ, Defendant and Appellant.
No. B139931.
Court of Appeal, Second District, Division Three.
May 31, 2001.
Review Granted September 12, 2001.
*553 Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Senior Assistant Attorney General, Kenneth C. Byrne *554 and Lance E. Winters, Supervising Deputy Attorneys General, for Plaintiff and Respondent.
FIDLER, J.[*]
Defendant and appellant Monica Mary Chavez appeals the judgment entered after she was convicted by a jury of the following crimes: Count 1, murder during the commission of a home invasion robbery and residential burglary within the meaning of Penal Code sections 187 and 190.2, subdivision (a)(17).[1] Count 2, residential burglary, first degree, in violation of section 211. Count 3, burglary, first degree, in violation of section 459. Counts 6 through 14, robbery, second degree, in violation of section 211. As to each count the jury found true the allegation that a principal was armed with a firearm, pursuant to section 12022, subdivision (a)(1). Probation was denied, and appellant was sentenced as follows:
Count 6, the mid-term of 3 years, plus 1 year for the firearm enhancement. Count 1, life without parole, plus 1 year for the enhancement, to run consecutive to count 6. In each of the remaining counts, 7 through 14,[2] appellant was sentenced to one-third the mid-term, 1 year to run consecutively to count 6. The sentence as to counts 2 and 3 was stayed pursuant to section 654. The enhancements as to counts 7 through 14 were stricken for sentencing purposes. Appellant was ordered to pay $10,000 in restitution pursuant to section 1202.4, subdivision (b) and given credit for 801 days of actual custody.

FACTUAL AND PROCEDURAL BACKGROUND

1. Prosecution's evidence.

Viewed in accordance with the usual rule of appellate review (People v. Rodriguez (1999) 20 Cal.4th 1, 11, 82 Cal.Rptr.2d 413, 971 P.2d 618) the evidence established the following:

Counts 12 through 14:
On November 3, 1997, Edward Bazurto was outside the office at a mobile home park located on Pioneer Boulevard in Norwalk. Two men came up and asked for a tenant who was unknown to Mr. Bazurto. The men then left, but returned later accompanied by a third man. One of the men put a gun to Mr. Bazurto's stomach and forced him inside the office. All of the suspects were armed. Also in the office was the manager of the mobile home park, Anna Deckard, and David Murillo. Money was taken from a drawer in the office. Mr. Murillo's wallet was taken, as was Mr. Bazurto's watch and Ms. Deckard's ring. Ms. Deckard was struck. When the suspects left they claimed they were from "Eme" (the Mexican Mafia). According to a statement given to the police by appellant and introduced in evidence, she had served as the driver and lookout for the robbery at the mobile home park. She knew a robbery was going to take place. The three male suspects were the codefendants and a person known as "Johnny."[3]

*555 Count 6:

On November 25, 1997, Frank Hernandez was at his barbershop in Paramount. A man came in, put a gun to his head and took his wallet.
According to appellant's statement she drove her codefendants to the barbershop, knowing there would be a robbery. Codefendant Vega committed the robbery.

Counts 7 and 8:
On January 1, 1998, at the Casa Gonzalez restaurant in Bellflower, an armed robber entered the restaurant and placed a gun to the head of the owner, Antonio Contreras, and asked for money. Two more armed, masked men then entered. Money was taken from the cash register, and Vega placed a gun to the head of Ronald Smith, a customer in the restaurant. Money, a watch and a ring were taken from Mr. Smith. Appellant admitted driving Vega, Rubio and Johnny to the restaurant, knowing a robbery was going to take place.

Count 9:
On January 6, 1998, a robbery took place at a Union 76 station in Paramount. An employee, Mohammad Rahman, had noticed a woman pumping gas. A man was with her. Later, an armed man followed Mr. Rahman into the cashier's booth and placed a gun to the back of his neck. Mr. Rahman opened the cash register and gave the robber money. While he was being robbed, Mr. Rahman saw that the car into which the woman had been pumping gas, was now at the cashier's booth. The robber ordered Mr. Rahman to place three boxes (90 cartons) of cigarettes into this car. A witness saw that this car was driven by a woman. There were children in the back seat.
In her statement, appellant told the police that she and Rubio, along with her grandchildren, stopped at a gas station. Rubio directed her to open the trunk and he took a gun out, robbed the attendant, and returned to the car. He then had the attendant load cigarettes into the car and she drove him away.

Counts 10 and 11:
These counts involved a robbery at a pager store in Paramount on January 7, 1998. Two employees, Fernando Prieto and Carol Chen, were in the store when three armed men, two of them wearing masks, came in and demanded money. Money was taken from the cash register and Mr. Prieto's wallet was taken. In addition, phones and pagers were taken.
In her statement, appellant told police she drove Vega, Rubio and Maestaz to the pager store, where each exited the car with a gun. After they exited the store, she drove them to Rubio's mother's house. She knew a robbery was going to take place.

Counts 1, 2 and 3:
These counts involved the burglary, robbery, and murder of George Blackwell in his home in Long Beach on January 12, 1998.
Appellant's statement to the police in conjunction with the testimony of witnesses including appellant established that on January 11, 1998, appellant and her codefendants went to the victim's home but he was not there. Rubio and Vega also talked about going to Warren High School in Downey, where both appellant and the victim worked, on January 12th in order to rob people. Appellant not only worked with the victim, he had counseled her son, who attended the school. Appellant also had done cleaning for the victim at his home in Long Beach.
*556 Appellant, Rubio and Vega drove to the victim's house on January 12th. Rubio planned to visit the victim and tell him appellant and Rubio were getting married in order to have the victim congratulate them. They brought a bottle of champagne with them. Along the way, duct tape was purchased and Rubio and Vega armed themselves. Appellant knew that the victim would be robbed and might be killed.
Appellant and Rubio went to the victim's house. Vega originally stayed on the beach, near the victim's house. The appellant and Rubio went inside the house. At some point Rubio accused the victim of having sex with appellant, which the victim denied. Vega then entered the house. Appellant and Vega went to the upstairs part of the house. While Vega burgled the house, appellant closed the window blinds. Appellant, Rubio and Vega were all wearing gloves, because it was cold and because they didn't want to leave fingerprints.
When Vega and appellant went downstairs, Rubio had the victim in the bathroom, with his hands bound. Rubio forced the victim to give him the personal identification number for his automated teller machine (ATM) card and to write out a check payable to appellant for $2,000. Appellant formed the belief that Rubio intended to kill her, as well as the victim.
Rubio then directed appellant and Vega to take the victim's car and cash the check. Appellant attempted to cash the check but was unable to do so because it was the wrong branch.
On their way to find the right branch they saw police cars around the victim's house. Vega stated, "Oh fuck, he did it." Vega told appellant that Rubio was not supposed to kill the victim. Appellant and Rubio abandoned the victim's car and drove away in appellant's car. Vega told appellant that he (Vega) was supposed to kill her as directed by Rubio.
Vega "made" appellant attempt to use the victim's ATM card because he needed money. Vega was still armed. Vega asked appellant not to "give him up." Although appellant did tell the police what happened, she did not initially identify Vega because she was grateful he had not killed her. However, in a later interview she told the police she did not identify Vega because she was afraid he would harm her family.
The victim was found dead of multiple gunshot wounds. Rubio was arrested near the victim's house. He was identified by an eyewitness who saw him leave the victim's house and the murder weapon was recovered from the bushes where the police first discovered Rubio.
In a statement made to the police, appellant acknowledged she knew what she was doing was wrong. In discussing her fear of Rubio she stated "he'd probably shoot me."

2. The Defense.

Appellant testified in her own defense. She had known Rubio for approximately seven or eight years. During that time he had been in and out of prison several times. After Rubio was paroled in 1996, he would go with appellant to her place of employment, Warren High School. Rubio signed up for a weightlifting class at the school, but would also follow appellant to school when he had no class. Rubio constantly accused her of "screwing the men" when she was supposed to be working. He accused her of always having affairs and threatened her with a gun. Rubio was sent back to prison for six weeks in 1997 and when he was released in August of 1997, he resumed following appellant to work, accusing her of engaging in sex acts with various men. Appellant was afraid of Rubio and feared for her own safety and *557 for the safety of her family. Rubio was capable of hurting many people. This fear kept her from driving away after the robbery at the mobile home park.
Prior to the robbery of the barbershop Rubio struck appellant with a club. She did not want to drive the car but Rubio insisted.
Shortly before the robbery at Casa Gonzalez, Rubio placed a gun to appellant's head and accused her of letting Vega "slap her on the butt." Rubio insisted she drive the car to Casa Gonzalez and she complied because of her fear Rubio would be out looking for her if she did not.
Appellant testified the gas station robbery was unexpected and she went along with it, because if she did not she believed Rubio would have shot her and her grandchildren. She further testified Rubio forced her to drive during the robbery of the pager store. Appellant testified that Rubio told her he would kill her and the police, if she ever called the police.
Appellant testified that she had no idea that Rubio was going to rob or harm Mr. Blackwell when they drove to his house on January 11th. That night Rubio made her get on her knees and "confess" to him. He alternated between hitting her on the head and petting her head. Rubio told her he had killed people before and had buried them in Elysian Park, where he intended to bury her. The morning of the murder, appellant went to see her daughter Martha and asked Martha to call Rubio's parole agent. Rubio had previously told appellant that if she ever called the police on him, she and her whole family would be taken out. Appellant further testified that in 1997 Rubio had told her that he and another person from "Erne" were going to kill her. During the drive to Mr. Blackwell's house, Vega and Rubio discussed getting tape because neither had brought handcuffs. Appellant believed they were talking about something that was going to happen at Warren High School. She volunteered to get the tape hoping to stall long enough for people to leave the school.
Adding to what she told the police, appellant testified she closed the window blinds because she feared that if the neighbors saw what was happening and called the police, Rubio would shoot her and then the police. When Rubio told Blackwell to make out the $2,000 check to appellant over her objections, she believed Rubio intended to kill her. When she told Vega she believed Rubio would kill both her and Mr. Blackwell, Vega replied Mr. Blackwell would be released. Appellant testified she had no intent to rob or kill Mr. Blackwell.
Appellant further testified that Rubio stated if he were ever arrested he would have everyone killed. Rubio saw a psychiatrist once a month and he had a prescription for thorazine. She feared Rubio and believed if she did not do what he told her to she would be beaten or killed right there or her family would be in trouble. The defense presented testimony of appellant's friends who described Rubio as obsessed and jumpy.
Appellant's daughter, Martha, testified that when her mother had given her the card for Rubio's parole agent, appellant told her that Rubio was crazy and was going to kill her.
The trial court did not allow the defense to present evidence concerning the defense of duress, nor to introduce evidence concerning battered women's syndrome. The trial court also sustained the prosecution's objection to appellant's attempt to introduce a post-arrest statement by Rubio and Vega that Rubio wanted Vega to kill appellant after the murder.

CONTENTIONS ON APPEAL
1. The trial court improperly excluded evidence of battered women's syndrome *558 and other evidence that she acted under duress, thereby denying appellant her due process right to present a defense;
2. The exclusion of battered women's syndrome evidence was improper because it was relevant to appellant's credibility and intent;
3. The exclusion of the post-arrest statement of Rubio and Vega was error and denied appellant her due process right to a fair trial; and
4. The trial court's errors in the aggregate constituted reversible and prejudicial error.

DISCUSSION

I

DURESS
In her brief counsel for appellant conceded that duress would not be available as a defense to a charge of murder involving special circumstances, even if the People did not seek the death penalty pursuant to section 26, subdivision six[4] and the cases of People v. Son (2000) 79 Cal. App.4th 224, 93 Cal.Rptr.2d 871 and People v. Petro (1936) 13 Cal.App.2d 245, 56 P.2d 984. The concession was withdrawn during oral argument. Our Supreme Court has granted a hearing in the case of People v. Anderson (2000) 85 Cal.App.4th 565, 102 Cal.Rptr.2d 245, review granted March 28, 2001 (S094710) on this issue.
We need not resolve this issue, for as we shall discuss, infra, under the facts of this case, the defense of duress was not available to appellant for any charge or for the predicate crimes that formed the basis of the felony murder theory that appellant was prosecuted under.
Initially, we recognize that the trial court in denying any evidence or instructions relating to duress, relied on an erroneous foundational requirement for the defense. Urged on by the prosecutor, the trial court found that appellant had failed to show there were no other reasonable alternatives than to participate in the criminal acts charged, citing the case of People v. Heath (1989) 207 Cal.App.3d 892, 255 Cal.Rptr. 120. That foundational requirement is actually one that applies only to the related, but distinctly different defense of necessity, as the court in Heath, supra, clearly points out.
However, despite this error, the trial court correctly noted that based upon the appellant's statements and testimony, she failed to show that any threat made to her placed her in immediate and imminent danger as required in raising the defense of duress. As the court in Heath, supra, stated: "Duress is an effective defense only when the actor responds to an immediate and imminent danger. `[A] fear of future harm to one's life does not relieve one of responsibility for the crimes he commits.' (People v. Lewis (1963) 222 Cal. App.2d 136, 141 [35 Cal.Rptr. 1]; People v. Lo Cicero (1969) 71 Cal.2d 1186, 1191 [80 Cal.Rptr. 913, 459 P.2d 241].)" (People v. Heath, supra, 207 Cal.App.3d at p. 900, 255 Cal.Rptr. 120, italics omitted.)
Therefore, despite the mistaken reliance on one required foundational aspect of the duress defense, the trial court properly found that appellant never established the immediate and imminent danger requirement *559 and properly refused to instruct the jury accordingly. As our Supreme Court has stated in People v. Smithey (1999) 20 Cal.4936, 972, 86 Cal.Rptr.2d 243, 978 P.2d 1171: "`"`[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citations.]"'" (We will discuss the possible impact of battered women's syndrome to appellant's belief that Rubio's threats did subject her to immediate and imminent danger, infra.)

II

BATTERED WOMEN'S SYNDROME AND DURESS
The defense of battered women's syndrome is allowed by Evidence Code section 1107 which states in pertinent part: "(a) In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syndrome, including the physical, emotional, or mental effects upon the beliefs, perception or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge, [¶] (b) The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness. Expert opinion testimony on battered women's syndrome shall not be considered a new scientific technique whose reliability is unproven."
Appellant attempted to introduce evidence of battered women's syndrome (hereinafter referred to as BWS) in order to show that because of BWS, she believed threats made to her by Rubio would be carried out immediately, even though an objective view of the threats would not show that was the case.
Appellant relies on People v. Humphrey (1996) 13 Cal.4th 1073, 56 Cal.Rptr.2d 142, 921 P.2d 1, for the proposition that because duress requires a reasonable belief as to the immediate danger of any threat, evidence as to what a defendant reasonably believed, as opposed to what objectively is reasonable, is admissible. Humphrey dealt with the issue of BWS as applied to self-defense. There the court held: "Although the ultimate test of reasonableness is objective, in determining whether a reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which [the] defendant found herself." (People v. Humphrey, supra, 13 Cal.4th at p. 1083, 56 Cal.Rptr.2d 142, 921 P.2d 1.)
Appellant argues that the reasonable person standard in the duress defense equates with that in self-defense and therefore BWS evidence that appellant had an imminent fear of death based upon past conduct by Rubio should have been presented to the jury.[5] Appellant argues that evidence of BWS was relevant to show she actually believed that Rubio had threatened her life or the lives of her family members and the belief'was reasonable. *560 This does no more than restate the "imperfect duress" defense that the Supreme Court rejected in People v. Bacigalupo (1991) 1 Cal.4th 103, 2 Cal.Rptr.2d 335, 820 P.2d 559, vacated and remanded on other grounds sub nom. Bacigalupo v. California (1992) 506 U.S. 802, 113 S.Ct. 32, 121 L.Ed.2d 5. Both the California Supreme Court and various Courts of Appeal have decided this issue contrary to the appellant's position.
In People v. Bacigalupo, supra, 1 Cal.4th 103, 2 Cal.Rptr.2d 335, 820 P.2d 559, our Supreme Court specifically held that: "In the case of robbery, however, the unreasonable belief that a defendant is acting under duress will not negate the requisite specific intent; that intent is to deprive the owner of the property taken." (Id. at p. 126, 2 Cal.Rptr.2d 335, 820 P.2d 559.) (See also People v. King (1991) 1 Cal.App.4th 288, 2 Cal.Rptr.2d 197 and People v. Kearns (1997) 55 Cal.App.4th 1128, 64 Cal.Rptr.2d 654.)
We note that in People v. Smith (1986) 187 Cal.App.3d 666, 679, 231 Cal.Rptr. 897, the Court of Appeal held that "an honest but unreasonable belief as to duress may negate the specific intent necessary for robbery and kidnapping for the purpose of robbery." In People v. King, supra, 1 Cal.App.4th at page 299, 2 Cal.Rptr.2d 197, the Court of Appeal found "Smith inappropriately extended the holding in Flannel [People v. Flannel (1979) 25 Cal.3d 668, 160 Cal.Rptr. 84, 603 P.2d 1] from the context of the mental state of malice to the distinct mental state of specific intent."
Even if we were to accept appellant's argument that Humphrey, supra, allows a defendant to introduce BWS evidence to support her assertion that she believed danger from a previous threat was imminent and thereby avail herself of a right to present evidence of duress, under the facts of this case she would still have failed to establish her right to the defense.
Appellant's statements to the police, as well as her testimony, clearly established her participation as an aider and abettor. She denied having any intent to actually rob anyone and claimed to have participated in her crime spree due to her fear. Nonetheless with the exception of the gas station robbery (of which she disclaimed any prior knowledge), appellant admitted driving her codefendants to the scenes of the various crimes with the knowledge of what they were about to do. Appellant thereby enabled her codefendants to commit the crimes, knowing it was wrong to do so. This makes her absolutely liable for each crime committed. An individual is liable as an aider and abettor when one has knowledge of the perpetrator's unlawful purpose coupled with the intent or purpose of committing, encouraging, or facilitating the commission of the offense and, by act or advice aids, promotes, encourages or instigates, the commission of the crime. (People v. Beeman (1984) 35 Cal.3d 547, 561, 199 Cal.Rptr. 60, 674 P.2d 1318.)
As established by her own testimony, no evidence of duress or BWS could have in any way excused or minimized appellant's intent as set forth in Beeman and Bacigalupo, supra. Therefore it was not error for the trial court to refuse to allow evidence of BWS as it related to the defense of duress.

III

BATTERED WOMEN'S SYNDROME: CREDIBILITY AND MENTAL STATE
Appellant argues that evidence of BWS should have been admitted as it related to both her mental state and her credibility. (Citing Humphrey, supra, 13 Cal.4th 1073, 56 Cal.Rptr.2d 142, 921 P.2d *561 1, People v. Williams (2000) 78 Cal. App.4th 1118, 93 Cal.Rptr.2d 356, People v. Morgan (1997) 58 Cal.App.4th 1210, 68 Cal.Rptr.2d 772, and People v. Gadlin (2000) 78 Cal.App.4th 587, 92 Cal.Rptr.2d 890.)
In the offer of proof presented to the trial court in support of admitting evidence concerning BWS, no mention was made of the use of BWS testimony regarding appellant's credibility. The appellant cannot raise this issue for the first time on appeal. (People v. Rogers (1978) 21 Cal.3d 542, 548, 146 Cal.Rptr. 732, 579 P.2d 1048.) The only relevant mental state at issue was the appellant's intent, and as we have discussed, supra, evidence of BWS was irrelevant to this issue.

IV

EXCLUSION OF THE CODEFENDANTS' LOCK-UP STATEMENTS[6]
Appellant attempted to introduce the post-arrest lock-up statements of her codefendants to the effect that Rubio told Vega "You should've swiped the bitch like I told you" to which Vega responded "I know. I know." Appellant testified that Vega told her Rubio wanted her killed after they left Mr. Blackwell's residence. Appellant wanted to introduce this evidence to show that her fear of Rubio was real and to help establish her credibility. The trial court found that the statement would not be relevant to the issue of why appellant went to Mr. Blackwell's residence and also that any probative value of the evidence was outweighed by the likelihood of prejudice as a result of it. (See Evid.Code, § 352.) Insofar as this evidence would have shown that appellant had a reason to fear Rubio and might tend to strengthen her credibility, it was error to exclude it. However, because the original statement came after the incident at Mr. Blackwell's house and for the reasons we have already discussed concerning the appellant's liability for the crimes committed as established through her own testimony, any such error is harmless. A reviewing court finding an erroneous exclusion of defense evidence must reverse only if it finds a reasonable probability the error affected the verdict adversely to the defendant. (People v. Humphrey, supra, 13 Cal.4th at p. 1089, 56 Cal.Rptr.2d 142, 921 P.2d 1.) There is no probability any such error affected the verdict in this case.

V

CONSIDERATION OF ANY ERRORS IN THE AGGREGATE
Appellant contends that when considered in the aggregate, any errors by the trial court constituted reversible and prejudicial error. (People v. Hill (1998) 17 Cal.4th 800, 72 Cal.Rptr.2d 656, 952 P.2d 673, People v. Jackson (1991) 235 Cal. App.3d 1670, 1 Cal.Rptr.2d 778 and Cal. Const., art. VI, § 13.) As we have discussed, supra, any errors committed were harmless in light of appellant's own testimony which absolutely established her guilt as an aider and abettor.

DISPOSITION
The judgment is affirmed.
KITCHING, Acting P.J., and ALDRICH, J., concur.
NOTES
[*] Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] All further statutory references will be to the Penal Code unless otherwise noted.
[2] Appellant's trial was severed from her codefendants Gilbert Rubio and Alex Vega. She was not charged in counts 4 and 5.
[3] "Johnny" was the boyfriend of Rubio's sister, Johnny Maestaz. (There is some confusion as to whether his last name is spelled Maestaz or Maestas.)
[4] Section 26 states that "All persons are capable of committing crimes except those belonging to the following classes: [¶] ... [¶] Six Persons (unless the crime be punishable with death) who committed the act or made the charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."
[5] The attorney general argues appellant made an insufficient showing of BWS as applied to the facts of this case. We are satisfied the showing was sufficient as an offer of proof. The attorney general also contends that the appellant has waived any federal constitutional claims regarding due process because of her failure to raise such a claim in the trial court, citing People v. Davis (1995) 10 Cal.4th 463, 503, footnote 1,41 Cal.Rptr.2d 826, 896 P.2d 119. We agree with the attorney general as to this point.
[6] For the reasons we discussed in footnote 5, supra, any constitutional claims of error on this issue have been waived by a failure to raise them in the trial court.